**UNITED STATES of America, Plaintiff,**

**v.**

**3.66 ACRES OF LAND, MORE OR LESS, situate IN the CITY AND COUNTY OF SAN FRANCISCO, STATE OF CALIFORNIA, et al., Defendants.**

**No. C–75–0863–CBR.**

United States District Court, N. D. California.

Feb. 14, 1977.

---

James L. Browning, Jr., U. S. Atty., Rodney H. Hamblin, Asst. U. S. Atty., San Francisco, Cal., for plaintiff.

Heller, Ehrman, White & McAuliffe, Weyman I. Lundquist, Peter S. Hecker, Randall I. Barkan, San Francisco, Cal., for defendant Cliff House Properties.

Robert S. Webber, Burlingame, Cal., for amicus Cliffside Properties.

Thomas M. O'Connor, City Atty., Daniel E. Collins, III, Deputy City Atty., San Francisco, Cal., for defendant City and County of San Francisco.

1. According to defendant Cliff House Properties, a survey has indicated that the property in question actually consists of 3.83 acres.

## MEMORANDUM OF OPINION

RENFREW, District Judge.

This is an action in condemnation by plaintiff United States to acquire defendants' land as part of the Golden Gate National Recreation Area, pursuant to 16 U.S.C. § 460*l* et seq. and 40 U.S.C. § 257. The land in question consists of approximately 3.66 acres [1] overlooking the Pacific Ocean on the western edge of San Francisco, California, and is owned by defendant Cliff House Properties, a California corporation ("Cliff House"). Only the southerly 1.21 acres of the land are improved. The improvements consist of the main Cliff House building and the adjacent Gift House building. These structures house various food, drink, and gift concessions. The amount of compensation due defendants for the property is in dispute and will be determined at a jury trial scheduled to commence on March 7, 1977.

Cliff House contends that the amount of just compensation in this case should include the value of its land as of the date of trial plus reimbursement for the loss of use of and certain taxes paid on the vacant portion of its land. The United States argues that just compensation should include only the fair market value of defendants' property as of the date of trial.

The Golden Gate National Recreation Area Act ("Act"), which went into effect on October 27, 1972, authorized the Secretary of the Interior to acquire, preserve, and administer certain areas of Marin and San Francisco Counties, California, "to provide for the maintenance of needed recreational open space * * *." Pub.L. No. 92–589, § 1, 86 Stat. 1299, 92d Cong., 2d Sess. (1972). The House Interior and Insular Affairs Committee discussed the privately owned land to be acquired in the San Francisco area:

"A. *San Francisco Unit.*—As already indicated above most of the lands in this unit are already in public ownership.

Amendment to Pre-trial Statement of Defendant Cliff House Properties (filed October 8, 1976).

The only privately owned lands are those generally known as the Sutro Baths and Cliff House properties (12.5 acres). Under the terms of H.R. 16444, these properties would only be purchased by the Government if the State and County lands in this unit are donated. It was the consensus of the Committee that the acquisition of these isolated, relatively expensive lands would not be warranted unless they formed a connecting link in a continuous chain of Federal lands along the Oceanfront." H.Rep. No. 92–1391, 92d Cong., 2d Sess. (October 11, 1972), 1972 U.S.Code Cong. & Admin.News pp. 4850, 4858.

On May 1, 1975, the United States filed this action seeking condemnation of defendants' property.

Cliff House argues that it is entitled to reimbursement for loss of use and taxes paid since October 27, 1972, because it "has been unable to sell, develop or otherwise use the vacant portion of its land" since the Act became law. Pre-trial Statement of Defendant Cliff House Properties (filed October 4, 1976). If the Court is unwilling to accept the October 27, 1972 date, Cliff House argues that compensation should be allowed at least for loss of use and taxes paid since May 1, 1975, when this suit was filed.

Federal law, which governs in a condemnation action brought by the United States,[2] clearly provides that a landowner is entitled to no compensation for or interest on the value of his property until there has been an actual taking. *Danforth v. United States*, 308 U.S. 271, 283–285, 60 S.Ct. 231, 84 L.Ed. 240 (1939). Moreover, it is well settled that "[t]he mere enactment of legislation which authorizes condemnation of property cannot be a taking. Such legislation may be repealed or modified, or appropriations may fail." *Danforth v. United States, supra*, 308 U.S. at 286, 60 S.Ct. at 237 (footnote omitted). *Accord, Beistline v. City of San Diego*, 256 F.2d 421, 423 (9 Cir.), cert. denied, 358 U.S. 865, 79 S.Ct. 96, 3 L.Ed.2d 98 (1958).

As the court observed in *Reservation Eleven Associates v. District of Columbia*, 136 U.S.App.D.C. 311, 420 F.2d 153, 157–158 (1969):

"The announcement or even internal consideration of general government planning, long before any condemnation activities, may have an effect on value of lands involved, sometimes a beneficial, sometimes an adverse effect. That the effect is adverse does not mean the government is required to compensate affected landowners for possible decreases in their land value when it comes to

**2.** *United States v. 93.970 Acres*, 360 U.S. 328, 332–333, 79 S.Ct. 1193, 3 L.Ed.2d 1275 (1959). Cliff House cites numerous state court decisions to support its position. Apart from being distinguishable on their facts, these cases do not turn on federal law. *City of Buffalo v. J. W. Clement Co.*, 28 N.Y.2d 241, 321 N.Y.S.2d 345, 269 N.E.2d 895 (1971), cited by Cliff House, best illustrates why a *de facto* taking argument is not applicable to this case:

"[T]he concept of *de facto* taking has traditionally been limited to situations involving a direct invasion of the condemnee's property or a direct legal restraint on its use [citations omitted], and to hold that there can be a *de facto* appropriation absent a physical invasion or direct legal restraint would, needless to say, be to do violence to a workable rule of law." 321 N.Y.S.2d at 356, 269 N.E.2d at 902.

"To hold the date of the *announcement* of the impending condemnation, whether directly to the condemnee or by the news media, consti-

tutes a *de facto* taking at that time, would be to impose an 'oppressive' and 'unwarranted' burden upon the condemning authority." 321 N.Y.S.2d at 358, 269 N.E.2d at 904.

The *amicus* brief submitted on behalf of Cliffside Properties, Inc., also relies almost exclusively on state cases and does not distinguish the strong line of federal decisions supporting plaintiff's position. The two federal decisions cited by *amicus* are not applicable to this case. *See Arastra Limited Partnership v. City of Palo Alto*, 401 F.Supp. 962 (N.D.Cal.1975), *vacated*, 417 F.Supp. 1125 (N.D.Cal.1976) (intended use of plaintiff's land made impossible by zoning ordinance); *Bydlon v. United States*, 175 F.Supp. 891, 146 Ct.Cl. 764 (1959) (access to plaintiff's property made impossible by Executive Order). Even if the facts of *Arastra* were similar to this case, *amicus* should not place great reliance on an opinion that specifically has been "vacated, set aside, and expunged." *Arastra Ltd. Partnership v. City of Palo Alto*, 417 F.Supp. 1125, 1126 (N.D.Cal.1976).

536

select specific properties for its project."
420 F.2d at 157 (footnotes omitted).

Similarly, the mere filing of a petition in condemnation by the Government does not constitute a taking for which compensation should be awarded. *United States v. 237,-500 Acres of Land*, 236 F.Supp. 44, 46 (S.D. Cal.1964), *aff'd sub nom. United States v. American Pumice Company*, 404 F.2d 336 (9 Cir. 1968); *23 Tracts of Land v. United States*, 177 F.2d 967, 970 (6 Cir. 1949).

Cliff House places great reliance on *Drakes Bay Land Company v. United States*, 424 F.2d 574, 191 Ct.Cl. 389 (1970), a case in which the Court of Claims found a "taking" to have occurred when a property owner was deprived of the economic use of his land even though the United States had not actually acquired title to or physically invaded his property. Cliff House contends that the logical extension of *Drakes Bay* compels this Court to conclude that a taking occurred in this case in 1972 when Congress enacted the Act. *Drakes Bay*, however, involved circumstances far different from those with which we are here concerned.

*Drakes Bay* involved the Point Reyes National Seashore Area ("Seashore") in Marin County, California, as authorized by Pub.L. No. 87–657, 76 Stat. 538 (1962), codified at 16 U.S.C. § 459c-1. The plaintiff in that case was a landowner who, in 1960, had purchased property adjacent to what would later become Seashore, with the intention of subdividing and selling it in small parcels. Park Service officials, however, repeatedly and emphatically discouraged the owner from going through with his plans, telling him that the United States planned to acquire his land. *Drakes Bay, supra*, 424 F.2d at 576–579. The United States did not buy plaintiff's land, however, and on July 23, 1963, the Government acquired a parcel of land over which plaintiff needed an easement to develop his own property. Thus, plaintiff was unable to develop his land after 1963. *Drakes Bay, supra*, 424 F.2d at 585–587.

The owner in *Drakes Bay* brought an action against the United States to recover just compensation for what he claimed to be a government taking. The court found that a taking within the meaning of § 3(a) of the Seashore Act had occurred—not by the passing of the legislation, but by the actions of Park Service employees:

"Thus [because of the Park Service activity] plaintiff remains without a market for its land. The private sector is not interested, understandably, because of the well publicized threat of eventual condemnation of Seashore realty. The public sector, namely the National Park Service, is not interested because after having successfully thwarted plaintiff's subdivision plans, it realizes that plaintiff is a party who can be deferred interminably, and dealt with at pleasure. We believe that such an attitude exemplifies exactly the kind of arbitrary and unreasonable treatment Congress sought to proscribe in Sec. 3(a) of the Act." 424 F.2d at 586.

The court in *Drakes Bay* ultimately held that the date of taking was July 23, 1963, when the United States acquired the land which made development of the plaintiff's property impossible. *Drakes Bay Land Company v. United States*, 459 F.2d 504, 505–506, 198 Ct.Cl. 506, (1972). In *Hilkovsky v. United States*, 504 F.2d 1112, 1113, 1115, 205 Ct.Cl. 460 (1974), the Court of Claims emphasized the narrowness of the holding in *Drakes Bay*:

"The mere description of the intended National Seashore by meets [*sic*] and boundaries in the same statute did not effect a taking by itself. Landowners normally would have to wait for the Government to get around to them. We held the Government had overreached in the case of the *Drakes Bay Land Co.*, tract and incurred Fifth Amendment just compensation liability as of an earlier date than it had intended, because of a special combination of circumstances." 504 F.2d at 1113.

"Plaintiffs' only complaint of Government taking [in *Hilkovsky*] is the length of time that the Government has been buying, trading for, or condemning theirs and others' lands within the boundaries

of the National Seashore, but that is not enough." 504 F.2d at 1115.

Cliff House argues that it deserves some compensation for the loss of value in its land over the past several years. While Congress has recognized that landowners sometimes deserve more compensation than the fair market value alone would provide, it did not intend such compensation to be recovered by the defendant in a condemnation action.

Congress attempted to fill some of the gaps in just compensation by enacting the Uniform Relocation Assistance and Real Property Acquisition Policy Act of 1970. Pub.L. No. 91–646, 84 Stat. 1894 (1971), codified at 42 U.S.C. § 4601 *et seq.* Section 303 of that act enumerates a number of expenses for which the United States will reimburse property owners, *e.g.,* moving costs, title expenses, increased replacement costs for comparable structures, and property taxes due after title vests in the United States. 42 U.S.C. § 4653. Section 102 of the act, however, explicitly provides that

"[n]othing in this chapter shall be construed as creating in any condemnation proceedings brought under the power of eminent domain, any element of value or of damage not in existence immediately prior to [the effective date of the act]." 42 U.S.C. § 4602(b).

If Cliff House wishes to recover damages in excess of just compensation, it should bring an appropriate action.[3]

For the reasons discussed above, the Court finds that just compensation in this case will be the fair market value of defendants' property at the date of trial, and no more.

---

[3] It appears that such an action should be brought in the Court of Claims rather than a United States District Court. The Tucker Act, 28 U.S.C. § 1346(a), allows individuals to sue the United States for damages caused by "any Act of Congress," but 28 U.S.C. § 1346(a)(2) limits district courts' jurisdiction in such cases to claims "not exceeding $10,000 in amount." Since defendants seek more than $10,000, they should bring suit in the Court of Claims. *Eccles v. United States,* 396 F.Supp. 792, 794–795 (D.N.D.1975). *See Washington v. Udall,* 417 F.2d 1310, 1320–1321 (9 Cir. 1969).