Opinion
 

 SIMS, Acting P. J.
 

 Plaintiff the owner of a 650-acre subdivision, substantially all of which was embraced within the permit area of the coastal zone created by the California Coastal Zone Conservation Act of 1972 (Pub. Resources Code, §§ 27000-27650, particularly §§ 27100 and 27104), has appealed from an order granting the defendant State of California’s motion for summary judgment and the judgment entered
 
 *741
 
 thereon.
 
 [1]
 
 The plaintiff sought damages
 
 [2]
 
 in inverse condemnation claiming that its land was taken by the state through the acts and omissions of the North Central Coast Regional Commission, a regulatory body created by the provisions of the coastal act.
 

 The thrust of the subdivider’s argument below and on appeal is that the state, through the passage of the coastal act and the subsequent acts and omissions of the regional commission, deprived it of the only use it had for its lands, that is, the sale of lots for the building of single family homes, and thereby took its property without the payment of just compensation. The trial court concluded on the record before it that the passage of the coastal act, although it affected the marketability of all projects within the permit area, did not constitute inverse condemnation; that the regional commission recognized the subdivider’s vested right to complete the improvements in one unit of the subdivision; that the subdivider had no vested right to construct improvements on its lots; and that the conditions the regional commission proposed to and did impose on the construction of improvements on lands within the subdivider’s holdings were reasonable and necessary to carry out the purposes of the coastal act. It also concluded that the subdivider was barred from seeking any relief because of a failure to exhaust its administrative remedies.
 
 [3]
 

 
 *742
 
 An examination of the undisputed facts, the purposes and provisions of the coastal act, and the precedents construing it reflects that the conclusions of the trial judge were correct. The judgment must be affirmed. We first set out the status of the subdivider’s property as it existed prior to November 8, 1972, the effective date of the coastal act, and then review the various acts and omissions which it contends constituted a taking of its property.
 

 Background
 

 In March 1971 the subdivider acquired the subdivision known as Oceana Marin located at Dillon Beach in Marin County. The property included some unsold lots in units 3 and 4 and approximately 550 acres of undeveloped land. It was subject to an existing purchase money deed of trust in the principal sum of $330,000 which required payments of $60,000 per year on principal and interest. Tentative subdivision maps of units 5 and 6 covering the 550 acres of land had been approved by the Marin County Planning Commission on March 16, 1970.
 

 The subdivider recorded the final subdivision map of unit 5 on March 3, 1972. The land was divided into 146 single family Tots, and as a condition of recording the final map, the subdivider posted a $500,000 subdivision performance bond with the county to guaranty the installation of all subdivision improvements. Prior to the recording of the final map the subdivider applied for and secured permits from five agencies, and thereafter from three more. An assessment district was formed for unit 5 and $660,000 was raised by the sale of special assessment bonds to pay a part of the costs of installing domestic water, sewage disposal and electrical systems in that unit of the subdivision. The principal and interest payments, which were a lien on the land, amounted to approximately $90,000 per year. The subdivider expended about $270,000 on subdivision improvements, and, at the time of the adoption of the coastal act, was committed to the expenditure of $200,000 more in order to complete streets within the unit.
 

 The time for filing the final subdivision map for the contemplated 174 single family lots in unit 6 had been extended to August 1973. During 1972 the subdivider proceeded with engineering work preparatory to recording such a final map.
 

 
 *743
 
 Admittedly the plaintiff was subdividing the land in Oceana Marin for the purpose of selling lots to the public as residential building sites. It is not engaged in the business of building homes, had never constructed a house, and did not intend to do so at Oceana Marin.
 

 The sale of lots to the public in Oceana Marin commenced in June 1972. and by November 8, 1972, 20 lots in unit 5 had been sold, and several lot owners were planning to build homes on their newly acquired property in the following spring.
 

 Period November 8, 1972•—March 1, 1973
 

 The subdivider categorically states that on November 8, 1972, following the majority vote to adopt the coastal act, his lots immediately became unsaleable, and that no one knew whether the lots could be built on. It would be more accurate to state that all interested were put on notice of the provisions of section 27400, which provided in pertinent part: “On or after February 1, 1973, any person wishing to perform any development within the permit area shall obtain a permit authorizing such development from the regional commission . . .” Such was the purport of an “Amended Final Subdivision Public Report” which the State Department of Real Estate issued on January 26, 1973, with respect to unit 5 of Oceana Marin.
 

 The subdivider, with justification, does complain that since the regional commission was not even organized until February 1973 it was impossible to obtain clarification regarding the use it could make of its property, and that its letter of inquiry on January 15, 1973, to a newly appointed member of the regional commission went unacknowledged and unanswered until March 1, 1973. In
 
 San Diego Coast Regional Com.
 
 v.
 
 See the Sea, Limited
 
 (1973) 9 Cal.3d 888 [109 Cal.Rptr. 377, 513 P.2d 129], the court ruled that the coastal act required a coastal permit for construction commenced after February 1, 1973, but did not require one for builders performing substantial lawful construction of their projects prior thereto. (9 Cal.3d at p. 890. See also
 
 Environmental Coalition of Orange County, Inc.
 
 v.
 
 AVCO Community Developers, Inc.
 
 (1974) 40 Cal.App.3d 513, 522-523 [115 Cal.Rptr. 59].) The majority opinion recognized that financial hardship was caused by the coastal act, and attempted to minimize it as follows: “Had the act been intended to require a permit for completion of construction commenced before 1 February, the requirement would as a practical matter have resulted in a moratorium on all construction in the permit area. The built-in delays
 
 *744
 
 incident to the issuance of permits, which could exceed seven months (§§ 27420. 27423), would have necessitated work stoppages for all development along the California coastline after 1 February 1973 for a significant period (except the rare uncompleted projects commenced prior to 1 April 1972). Such interference with construction in progress, tantamount to a moratorium, would result in serious economic dislocations not contemplated by the act, its authors, or the voters. [¶] Therefore, in the absence of language in the act imposing a moratorium, it is reasonable to conclude the voters intended none.”
 
 (Id,
 
 p. 892, fn. omitted.)
 

 Despite the ruling in the foregoing case, a property owner could only proceed at his peril in performing any development because the provisions of section 27404 only expressly exempted developments in which substantial work had been performed pursuant to a building permit, prior to April 1, 1972 (subsequently Stats. 1973, ch. 28, § 1, effective Apr. 18, 1973, amended to Nov. 8, 1972) and the act provided severe civil penalties for its violation (§§ 27500 and 27501). It was subsequently held that an application for a claim for exemption as provided by the statewide coastal commission’s rules was a necessary predicate to raising a vested right to an exemption in court.
 
 (South Coast Regional Com.
 
 v.
 
 Gordon
 
 (1977) 18 Cal.3d 832, 834 and 837, fn. 4 [135 Cal.Rptr. 781, 558 P.2d 867], distinguishing
 
 San Diego Coast Regional Com.
 
 v.
 
 See the Sea, Limited,
 
 supra; and
 
 State of California
 
 v.
 
 Superior Court (Veta Company)
 
 (1974) 12 Cal.3d 237, 249-250 [115 Cal.Rptr. 497, 524 P.2d 1281]; and
 
 Davis
 
 v.
 
 California Coastal Zone Conservation Com.
 
 (1976) 57 Cal.App.3d 700, 708 [129 Cal.Rptr. 417].)
 

 The subdivider is entitled to challenge the constitutionality of the coastal act on its face even though it failed to make such a challenge before the regional commission at the time it applied for an exemption, or in its subsequent application for a permit. It cannot, however, challenge the constitutionality of the manner in which the provisions of the act were applied to him by the regional commission without having raised constitutional objections before that body.
 
 (State of California
 
 v.
 
 Superior Court (Veta Company), supra,
 
 12 Cal.3d 237, 250-252.)
 

 The question of. the propriety of delaying any right to secure a permit for the period between November 1972 and February 1973, or the right to recover compensation for that delay, does not appear to have been expressly considered. Nevertheless, it is embraced within the principles that have sustained the validity of imposing a moratorium for
 
 *745
 
 a four-year period to formulate a coastal plan, and that have denied the right of the property owner to recover damages for inverse condemnation.
 

 In
 
 Avco Community Developers, Inc.
 
 v.
 
 South Coast Regional Com.
 
 (1976) 17 Cal.3d 785 [132 CaLRptr. 386, 553 P.2d 546], the developer attacked the constitutionality of the act and alleged that he had been deprived of the value of his land. The court stated: “Our conclusion that no vested right inures to proceed with development of tract 7479 does not strip this land of all value. The result is merely that Avco, like all other landowners in the coastal zone who have not acquired a vested right to develop their property, must apply to the commission for a permit and, if the application is denied, then the desired buildings on the tract cannot be constructed during the period the Act is in effect. As we pointed out in
 
 State of California
 
 v.
 
 Superior Court (Veta), supra,
 
 12 Cal.3d 237, 253, the Act is only an interim measure designed to assure that valuable coastal zone resources are not irreversibly committed during the time the commission is developing a comprehensive plan for the orderly development of the coast, and the permit requirement will automatically be repealed 91 days after adjournment of the 1976 regular session of the Legislature.” (17 Cal.3d at pp. 801-802. See also
 
 State of California
 
 v.
 
 Superior Court (Veta Company), supra,
 
 12 CaL3d 237, 253; and
 
 Davis
 
 v.
 
 California Coastal Zone Conservation Com., supra.
 
 57 Cal.App.3d 700, 708.)
 

 In the
 
 Veta Company
 
 case the court, with some skepticism, accepted the developer’s pleading that its application for a permit was denied in order that its land would “ ‘remain undeveloped, and devoted to, and held for. public use as open space land.’ ” (12 Cal.3d at pp. 252-253.) After examining the provisions of the coastal act, the court summarized, “Thus, the requirement for a permit is an interim measure to assure that developments in the coastal zone are consistent with the objectives of the Act so that priceless coastal resources are not irreversibly committed to uses which would be inconsistent with the plan ultimately developed.” (12 Cal.3d at p. 253.) The court then reviewed precedents upholding the validity of interim zoning ordinances and other measures to preserve the status quo pending adoption of a comprehensive zoning plan. It concluded: “In view of the foregoing authorities, denial of a building permit to Veta on the ground that the land it proposes to develop may ultimately be designated for public use in the coastal zone plan to be adopted by the Commission by December 1975, does not amount at this time to a taking of property for public use without compensation. The
 
 *746
 
 trial court therefore erred in overruling the general demurrer to the sixth cause of action.” (12 Cal.3d at p. 255. See also
 
 CEEED
 
 v.
 
 California Coastal Zone Conservation Com.
 
 (1974) 43 Cal.App.3d 306, 324-325 [118 Cal.Rptr. 315]; and
 
 Davis
 
 v.
 
 California Coastal Zone Conservation Com., supra,
 
 57 Cal.App.3d 700, 708.)
 

 in
 
 Sierra Club
 
 v.
 
 California Coastal Zone Conservation Com.
 
 (1976) 58 Cal.App.3d 149 [129 Cal.Rptr. 743], in response to the contention that the public had a vested right that the California coastal zone would be preserved in the state as it existed at the time of the passage of the coastal act, the court stated: “But the act does not establish any present possessory interest of the people of the State of California in property lying within the coastal zone. Although such possessory interest may be established over at least part of the coastal zone as a result of the planning function established by the act (see §§ 27300 et seq., 27320), the only actual control over the coastal zone which has been vested in the public by the Act has been by way of the permit-granting function of the regional and state Commissions within the coastal zone ‘permit area.’ (§§ 27104. 27400 et seq., 27420 et seq.) If the public’s rights in the coastal zone were presently vested, the result would have constituted a taking of property from all landholders within the coastal zone. [Citations.] Appellant, as part of the public, has no vested right in the coastal zone.” (58 Cal.App.3d at p. 155.)
 

 The subdivider’s argument that the coastal act was invalid because, as an initiative measure, it denied a right to a hearing before imposing restrictions on the use of land, has been often answered. (See
 
 Avco Community Developers, Inc.
 
 v.
 
 South Coast Regional Com., supra,
 
 17 Cal.3d 755, 800-801;
 
 San Diego Bldg. Contractors Assn.
 
 v.
 
 City Council
 
 (1974) 13 Cal.3d 205, 210-218 [118 Cal.Rptr. 146, 529 P.2d 570, 72 A.L.R.3d 973]; and
 
 CEEED
 
 v.
 
 California Coastal Zone Conservation Com., supra,
 
 43 Cal.App.3d 306, 312-320.) The case last cited also refuted arguments that the coastal act was unconstitutional because it constituted an invalid state intrusion into municipal affairs of chartered cities, because it unlawfully delegates legislative power to the commission, because it fails to provide for procedural due process in permit applications, and because it infringes on the fundamental right to travel. (See 43 Cal.App.3d at pp. 320-324, 325-329, 329-330 and 330-333.)
 

 The subdivider has failed to show he is entitled to any damages for losses incurred because of the moratorium placed on the development of unimproved lots during the period from November 1972 to March 1973.
 

 
 *747
 

 Application for and Action on Claim for Exemption
 

 The state commission held its first meeting February 15, 1973. On March 1, 1973, forms were made available for property owners claiming an exemption from the provisions of the coastal act (see § 27404). The subdivider applied to the regional commission for an exemption to allow completion of the improvements in unit 5, and to allow the construction of homes on any lot in units 3, 4 and 5 by any person. The subdivider alleged that its lots continued to be unsaleable, and it pointed out that it had no income with which to pay real property taxes, or meet assessment bond payments, or mortgage payments.
 

 The application for exemption came on for hearing on May 3, 1973. At that time the subdivider advised the regional commission that it had invested in excess of $750,000 in subdivision improvements, that the lots were completely unsaleable because prospective lot buyers did not know whether the commission would issue permits to build houses, and that it was still unable to meet its fixed payments. Although no application had been filed with respect to unit 6, the subdivider advised the regional commission that without the income from the sale of lots it could not complete the work and record the final subdivision map for unit 6, and that the tentative map of that unit could not be renewed by the County of Marin.
 
 [4]
 

 On that date the regional commissioners found that the subdivider had a vested right to complete the subdivision of unit 5, and that the subdivision of units 1, 3 and 4 had been completed. It recognized and granted the claim of exemption from the coastal act for the development consisting of the completion of the subdivision of unit 5. The commission found that, the erection of houses by individual purchasers on individual lots in all units would constitute separate developments within the meaning of the coastal act. It found that the development of the lots by
 
 *748
 
 the future erection of houses was not exempt from the permit provisions of the coastal act, and accordingly denied the claim of exemption. In so segregating the development and denying the claim of exemption for the erection of structures the regional commission was acting as authorized under the coastal act.
 

 In
 
 Avco Community Developers, Inc.
 
 v.
 
 South Coast Regional Com., supra,
 
 17 Cal.3d 785, the developer, as here, had filed a final subdivision map. approved by the county, for one tract of its larger holdings. The county had authorized the construction of 18,925 residential units on 27 parcels, devoted principally to multiple residential uses, according to “Planned Community District Regulations.” The opinion states: “By February 1, 1973, pursuant to approvals issued for such purposes by the county. Avco had completed or was in the process of constructing storm drains, culverts, street improvements, utilities, and similar facilities for the tract as well as for the remainder of the Capron property. Under the county’s building code, a permit could not be obtained until grading had been completed. Avco had not completed the rough grading by February 1. 1973, and it neither submitted building plans for the tract nor obtained a permit to construct any structures. Before that date, the company had spent $2,082,070 and incurred liabilities of $740,468-for the development of the tract; it is losing $7.113.46 a day, largely due to loss of anticipated rental value, as a result of its inability to proceed with construction of buildings on the tract.” (17 Cal.3d at pp. 789-790.)
 

 The developer sought judicial review after the regional and state commissions had denied it an exemption on its claim that it had a vested right to complete the development. The action of the trial court is reported as follows: “Although the court opined that fairness suggested Avco be allowed to complete development of the tract in accordance with the map, the regulations and the model, nevertheless because Avco did not have a building permit the trial court felt compelled to hold that it did not have a vested right to construct the buildings, and thus was not exempt from the permit requirement of the Act.”
 
 (Id.,
 
 p. 790.) The Supreme Court rejected the developer’s contentions that it had a vested right to complete the proposed buildings under the common law or under the provisions of the act. It concluded, “If we were to. accept the premise that the construction of subdivision improvements or the zoning of the land for a planned community are sufficient to afford a developer a vested right to construct buildings on the land in accordance with the laws in effect at the time the improvements are made or the zoning enacted, there could be serious impairment of the government’s right to
 
 *749
 
 control land use policy. In some cases the inevitable consequence would be to freeze the zoning laws applicable to a subdivision or a planned unit development as of the time these events occurred.”
 
 (Id.,
 
 p. 797. See also
 
 Oceanic California, Inc.
 
 v.
 
 North Central Coast Regional Com.
 
 (1976) 63 Cal.App.3d 57, 67 and 69-70 and 76-77 [133 Cal.Rptr. 664]; and
 
 Sierra Club
 
 v.
 
 California Coastal Conservation Com., supra,
 
 58 Cal.App.3d 149, 157.)
 

 In this case acknowledgedly no building permit had been issued to the subdivider or to the owner of any unimproved lot. It was admitted that construction on each lot would be a separate project. There was, therefore, no right to an exemption. (See
 
 South Coast Regional Com.
 
 v.
 
 Higgins
 
 (1977) 68 Cal.App.3d 636, 644-645 [137 Cal.Rptr. 551]; and
 
 Oceanic California, Inc.
 
 v.
 
 North Central Coast Regional Com., supra,
 
 63 Cal.App.3d 57, 77-80.)
 

 Permit Proceedings
 

 At the hearing on May 3, 1973, the regional commission followed the legal advice of the Attorney General in denying the exemption for the construction of homes by lot owners. The Attorney General also advised the commissioners that'they could legally grant the subdivider a “blanket permit” which would allow the construction of a house on any lot in units 3, 4 or 5 by any person. On June 18, 1973, the subdivider at the suggestion of the regional commission, applied for a permit to cover the construction of single family homes on 180 lots in units 3, 4 and 5.
 

 At a meeting on July 5, 1973, the regional commission discussed in general its power to condition blanket permits,
 
 [5]
 
 but it expressed no
 
 *750
 
 intention of imposing any new conditions on the subdivider’s subdivision as a condition of allowing third party lot owners to build on their lots. A study by the staff of the regional commission revealed that there were substantial geological problems affecting the subdivision, including active landslide areas, expan ding/swelling soils, high water table, bluff erosion/recession and proximity to the San Andreas fault. The staff also noted that there was a need for strict architectural controls for aesthetic as well as safety reasons; a need for adequate access to and signposting for public beach areas; and a need to provide for and designate responsibility for the maintenance of the common or open areas within the subdivision.
 

 On July 18, 1973, without any prior consultation with the subdivider, the staff rendered a report recommending 13 conditions to be imposed as a condition to the issuance of a blanket permit for home construction in units 3, 4 and 5. They generally provided for the composition of and the criteria to be followed by a “Design Review Committee”; for the control of erosion; for access to and signposting of access to, the beach; and for
 
 *751
 
 the maintenance of common lands. The subdivider objected to the conditions because it claimed they would render its lots still more unsaleable. It particularly objected to the following provision: “That the homeowners’ association agree to repair damage in the common areas due to landslides, soil creep, sloughing, slumping, gullying; or erosion. This repair shall be undertaken on no less than on an annual basis.” According to the subdivider this would make the lot owners responsible for the cost of stabilizing the California coast line. It also refused to accede to a condition that the staff of the regional commission have in effect a veto over approval by the “Design Review Committee.”
 

 In 1970 the subdivider’s predecessor in interest had dedicated to the County of Marin four beach access easements extending from streets in unit 1, and other easements insuring public access to the Pacific Ocean. Nevertheless, in August at the first public hearing on the application for the blanket permit, the regional commission indicated its desire to require the subdivider to dedicate an additional easement for a" right-of-way for public access along a one and one-third mile stretch of ocean front along the bluffs overlooking the ocean at Oceana Marin. At that meeting the subdivider complained that only six lots had been sold since November 8, 1972.
 

 At a second public meeting on September 6, 1973, the regional commission indicated that the unlimited liability of lots owners under the clause quoted above and the dedication last referred to were absolute requirements for the granting of a blanket permit. The subdivider advised the commission that the two conditions were unacceptable, that they created insurmountable problems which would continue to make its lots unsaleable, and that it would not accept a permit on such conditions. The minutes, however, indicate that the easement along the bluff was negotiable. The matter was continued to September 20. On September 17, the subdivider formally withdrew its application for a blanket permit on the advice of its real estate brokers that the conditions would hurt rather than help the property.
 
 [6]
 

 Despite the withdrawal of the subdivider’s application the regional commission on September 20, 1973, on its own initiative, adopted eight
 
 *752
 
 conditions to be applied to any permit for development by construction of a home at Oceana Marin. These conditions referred to the design committee already created by deed restrictions applicable to the subdivision. They made it clear that the executive director of the North Central Coast Regional Commission had no authority to reject approval of plans and specifications which complied with the permit. The liability of lot owners for maintenance of the common areas was limited to an aggregate maximum of
 
 $5,000
 
 per year. One condition did appear to refer to dedication of the easement to which the subdivider had objected.
 
 [7]
 

 Thereafter a lot owner in unit 3 applied for a permit and because his lot was considered an integral part of the subdivision he was on November 1, 1973, denied a permit because the conditions recommended for the resolution of specific problems in the overall development had not been met or satisfied. In November the subdivider was advised that the Attorney General had ruled that the regional commission was without jurisdiction to issue a “blanket permit.” The commission on November 7, 1973, did send out a notice to all property owners concerning the necessity for cooperative action between the developer and the individual lot owners, preferably acting through their homeowner’s association, in order to fulfill the criteria established in the conditions adopted September 20, 1973.
 

 On December 21, 1973, the subdivider presented a claim for $3,935,800 to the State Board of Control. It was denied on January 15, 1974, and this action was filed May 20, 1974.
 

 Meanwhile the lot owner from unit 3, on January 21, 1974, reapplied for a permit. As a result of discussions with lot owners and the homeowners association, 10 modified conditions were promulgated on March 21, 1974,
 
 [8]
 
 and on that date the lot owner secured a permit subject
 
 *753
 
 to approval of the overall conditions, by the homeowners association. A second lot owner from unit 5 applied for a permit on March 26, 1974. On May 9, 1974, his permit was approved, but construction under the permit was stayed until the regional commission found that satisfactory progress had been made toward the initiation or accomplishment of the overall conditions for Oceana Marin adopted in March 1974. The lot owner sought judicial review and the trial court upheld, the conditions in an intended decision filed January 3, 1975.
 

 The parties have not argued the validity of the conditions imposed by the regional commission in detail. It is established that a regulatory body may require a dedication of property in the interests of the general welfare as a condition of permitting the subdivision of lands. In
 
 Associated Home Builders etc., Inc.
 
 v.
 
 City óf Walnut Creek
 
 (1971) 4 Cal.3d 633 [94 Cal.Rptr. 630, 484 P.2d 606, 43 A.L.R.3d 847], the court upheld the provisions of section 11546 of the Business and Professions Code that authorize the governing body of a city or county to require that a subdivider must, as condition to the approval of a subdivision map, dedicate land or pay fees in lieu thereof for park or recreational purposes. The court relied upon
 
 Ayres
 
 v.
 
 City Council of Los Angeles
 
 (1949) 34 Cal.2d 31 [207 P.2d 1, 11 A.L.R.2d 503], which had upheld a requirement of a dedication of land for a thoroughfare abutting on the subdivision. In the later case the court analyzed the earlier case as follows: “We held that the city was not acting in eminent domain but, rather, that a subdivider who was seeking to acquire the advantages of subdivision had the duty to comply with reasonable conditions for dedication so as to conform to the welfare of the lot owners and the general public. We held, further, that the. conditions were not improper because their fulfillment would incidentally benefit the city as a whole or because future as well as immediate needs were taken into consideration and that potential as well as present population factors affecting the neighborhood could be considered in formulating the conditions imposed upon the subdivider. We do not find in
 
 Ayres
 
 support for the principle urged by Associated that a dedication requirement may be upheld only if the particular subdivision creates the need for dedication.” (4 Cal.3d at p. 638.)
 

 So here the subdivider was in effect caught in a rezoning which, although, cast as a moratorium, was designed to permit development
 
 *754
 
 which was consistent with the plan to be devised. It was proper to condition the development permits on the dedication of easements for the general welfare, particularly for access to the public beaches along the coast. Moreover, it was consistent with the welfare of the public and those who would live within the subdivision to provide for maintaining the common areas. To state the contrary is to demonstrate the validity of the condition. Is there a vested right to divide and sell land leaving unbuildable areas free to erode away to the future detriment of the public and those within the subdivision? The answer is obvious, and the commission acted properly in the premises. If the first conditions were too onerous on prospective lot owners, and the foregoing conclusions are erroneous, the subdivider and the lot owners, of which it was the principal owner in unit 5, had their rights to administrative and judicial review.
 

 Failure to Exhaust Administrative Remedies
 

 The subdivider by withdrawing his application for a blanket permit, placed itself in the position of one who has failed to exhaust his administrative remedies. He not only failed to continue to assert his contentions to the initial hearing body, but he abandoned the right he had to seek review by the state commission (§ 27423), and judicial review of its decision if still dissatisfied. (§ 27424; and see Code Civ. Proc.. § 1094.5.)
 

 The cases referred to above have established that the objector must exhaust his administrative remedies before seeking judicial review of a regional commission’s action on an application for an exemption.
 
 (South Coast Regional Com.
 
 v.
 
 Gordon, supra,
 
 18 Cal.3d 832, 834; and
 
 State of California
 
 v.
 
 Superior Court (Veta Company), supra,
 
 12 Cal.3d 237, 250-252.) There is no reason the same rule should not apply to review of the denial of a permit, or review of the grant of a permit on conditions which the permittee contends are invalid or unwarranted. “This is the doctrine of ‘exhaustion of administrative remedies.’ In brief, the rule is that where an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act.”
 
 (Abelleira
 
 v.
 
 District Court of Appeal
 
 (1941) 17 Cal.2d 280, 292 [109 P.2d 942, 132 A.L.R. 715], See also
 
 Metcalf
 
 v.
 
 County of Los Angeles
 
 (1944) 24 Cal.2d 267, 269-273 [148 P.2d 645];
 
 Davis
 
 v.
 
 California Coastal Zone Conservation Com., supra,
 
 57 Cal.App.3d 700, 704-705;
 
 Igna
 
 v.
 
 City of Baldwin Park
 
 (1970) 9 Cal.App.3d 909, 914 [88 Cal.Rptr. 581];
 
 Smith
 
 v.
 
 City of Duarte
 
 (1964)
 
 *755
 
 228 Cal.App.2d 267, 269-270 [39 Cal.Rptr. 524]; and
 
 Dunham
 
 v.
 
 City of Westminster
 
 (1962) 202 Cal.App.2d 245, 248-250 [20 Cal.Rptr. 772].) In
 
 Igna
 
 v.
 
 City of Baldwin Park, supra,
 
 the zoning ordinance provided that the offended landowner could apply for a permit to continue the nonconforming use of her land. She declined to do so and filed an action to compel the issuance of certain permits by way of mandamus, and sought injunctive and declaratory relief, and damages by way of inverse condemnation. The court affirmed a judgment entered after a demurrer had been sustained without leave to amend, because it appeared she had failed to exhaust her administrative remedies.
 

 The subdivider claims he was not required to exhaust his administrative remedies between November 1972 and March 1973 because there was no commission in existence. (See
 
 Eye Dog Foundation
 
 v.
 
 State Board of Guide Dogs for the Blind
 
 (1967) 67 Cal.2d 536, 543-544 [63 Cal.Rptr. 21, 432 P.2d 717]; and
 
 Bernstein
 
 v.
 
 Smutz
 
 (1947) 83 Cal.App.2d 108, 114-115 [188 P.2d 48].) While it may be true that there was no administrative body during that period, it was clear from the terms of the coastal act that one would be in existence. The cases which have been reviewed above indicate that any interim moratorium on development was not actionable.
 

 Once the commission was appointed the subdivider had an opportunity for a full hearing, not only on its claim for exemption by virtue of vested rights, but also for a permit for the development of the lots it owned.
 
 Fuentes
 
 v.
 
 Shevin
 
 (1972) 407 U.S. 67 [32 L.Ed.2d 556, .92 S.Ct. 1983], and related cases which require a hearing before a person is deprived of any significant property interest, are not in point. The constitutionality of the coastal act has been sustained, because as an initiative ordinance, the original interference with the property rights of landowners was legislative not judicial. (See
 
 Avco Community Developers, Inc.
 
 v.
 
 South Coast Regional Com., supra,
 
 17 Cal.3d 785, 800-801; and
 
 San Diego Bldg. Contractors Assn.
 
 v.
 
 City Council, supra,
 
 13 Cal.3d 205, 210-218. See also
 
 CEEED
 
 v.
 
 California Coastal Zone Conservation Com., supra,
 
 43 Cal.App.3d 306, 312-320.) The case last cited also established that there was no “due process” violation by the act itself, or by the procedures established for hearing permit applications (43 Cal.App.3d at pp. 325-330).
 

 The subdivider also implies that he could not assert any rights before the administrative tribunal because the Attorney General ultimately indicated that the commission could not issue “blanket permits.”
 

 
 *756
 
 Sections 27423 and 27424 dealing with appeals and review require that any person be “aggrieved.” In
 
 Klitgaard
 
 &
 
 Jones, Inc.
 
 v.
 
 San Diego Coast Regional Com.
 
 (1975) 48 Cal.App.3d 99 [121 Cal.Rptr. 650], the court undertook to define the term and concluded: “We are not prepared to ignore the word ‘aggrieved’ so as to make it surplusage; nor will we give it so harrow an interpretation as to do harm to the purpose of the Act. With these factors in mind, we have determined that to be ‘aggrieved,’ a ‘person’ must, at the time of the hearing, be either (1) a resident of California, (2) a citizen of California, or (3) have a pecuniary or proprietary interest in the outcome of a permit hearing. Such a construction accommodates the need for a broad standing rule, while doing no violence to the express statutory language.” (48 Cal.App.3d at p. 110.) It is clear that at all times the subdivider, not only as a seller of lots, but as. the owner of a substantial number of lots, had both a pecuniaiy or proprietary interest in the outcome of the hearings at which the conditions were approved, whether they be called “blanket permits,” or criteria or conditions for the issuance of permits for the development of lots in units 3, 4 and 5 by the construction of single family homes.
 

 Finally, the subdivider relies on the doctrine that the exhaustion of administrative remedies does not apply “when the aggrieved party can positively state what the administrative agency’s decision in his particular case would be. [Citations.]”
 
 (Ogo Associates
 
 v.
 
 City of Torrance
 
 (1974) 37 Cal.App.3d 830, 834 [112 Cal.Rptr. 761]. See also
 
 Eldridge
 
 v.
 
 City of Palo Alto
 
 (1976) 57 Cal.App.3d 613, 632-633 [129 Cal.Rptr. 575]; and
 
 Sneed v. County of Riverside
 
 (1963) 218 Cal.App.2d 205, 212 [32 Cal.Rptr. 318].) The rationale of the foregoing cases is explained in
 
 Ogo Associates
 
 v.
 
 City of Torrance,
 
 as follows: “The evidence is overwhelming that the city council rezoned the Victor Precinct área because appellants planned to build their project there; it is inconceivable the city council would grant a variance for the very project whose prospective existence brought about the enactment of rezoning. This is not a situation where the possibility of relief from a general policy exists because of the unusual circumstances of a particular case; to the contrary, in this instance the circumstances of the particular case gave birth to the ordinance’s general policy. To require appellants to apply to the city council for a variance on behalf of this project would be to require them to pump oil. from a dry hole.” (37 Cal.App.3d at p. 834.) Similarly in
 
 Eldridge
 
 v.
 
 City of Palo Alto, supra,
 
 the majority of the court pointed out that the proposed development would be completely contraiy to the goal of preserving the land in its natural or near natural state, so it was not necessary to apply for rezoning or a variance. In
 
 Sneed,
 
 the public had already invaded the
 
 *757
 
 landowner’s airspace, and the court recognized “a distinction between the commonly accepted and traditional height restriction zoning regulations of buildings and zoning of airport approaches in that the latter contemplates actual use of the airspace zoned, by aircraft, whereas in the building cases there is no invasion or trespass to the area above the restricted zone.” (218 Cal.App.2d at p. 209.)
 

 In this case insofar as there was an intent to keep any land in its natural or near natural state it was only for a temporary period, which, as we have seen, has been authorized by the courts. In fact, however, the coastal commission consistently recognized the right of lot owners, including the subdivider itself, to build homes on the lots in the subdivision, provided that they complied with conditions reasonably related to preserving attributes of the property which the electorate had deemed of importance. There was no reason why the subdivider could not have tested the validity of those conditions through the administrative and judicial, proceedings provided by law. We cannot assume that any invalid conditions would have been approved after such review.
 
 [9]
 

 Inverse Condemnation
 

 In the ruling on the demurrer (see fn. 3 above), the court relied upon
 
 Klopping
 
 v.
 
 City of Whittier
 
 (1972) 8 Cal.3d 39 [104 Cal.Rptr. 1, 500 P.2d 1345] and
 
 Bydlon
 
 v.
 
 United States
 
 (1959) 175 F.Supp. 891 [146 Ct.Cl. 764]. The former case concluded: “[W]e hold that a condemnee must be provided with an opportunity to demonstrate that (1) the public authority acted improperly either by unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation; and (2) as a result of such action the property in question suffered a diminution in market value.” (8 Cal.3d at p. 52.) Since the state has never taken any action to condemn the subdivider’s property, the case does not appear pertinent. (See
 
 Selby Realty Co.
 
 v.
 
 City of San Buenaventura
 
 (1973) 10 Cal.3d 110, 119 [109 Cal.Rptr. 799, 514 P.2d 111].) In
 
 Bydlon
 
 the court of claims upheld an award of compensation because two resort owner's, who had purchased from the government, had a way of necessity which was destroyed by a government regulation prohibiting flights below 4,000 feet
 
 *758
 
 over the wilderness area. Significantly no compensation was paid to two other resort owners who suffered a dimunition in the value of their resort properties because they had other access. The damages were not, as claimed here, the value of the property, but the dimunition in the value of the property by the loss of the easement of necessity. (See 175 F.Supp. at pp. 891 and 916.)
 

 Here the subdivider is not attempting to secure damages because of the imposition of a restrictive covenant concerning the maintenance of common lands, or the value of the requested easement along the ocean bluffs. Neither of those threatened “takings” which, as we have seen, are well within the regulatoiy power of government, entrenches physically upon the lots which it wishes to sell. In
 
 Selby Realty Co.
 
 v.
 
 City of San Buenaventura, supra,
 
 10 Cal.Sd 110, the court, in concluding that there was no taking by the adoption of a general plan which indicated dedication of a street might be required in the future, stated: “The adoption of a general plan is several leagues short of a firm declaration of an intention to condemn property. It is too clearly established to require extensive citation of authority that under certain circumstances a governmental body may require the dedication of property as a condition for its development (see e.g.,
 
 Associated Home Builders etc., Inc.
 
 v.
 
 City of Walnut Creek
 
 (1971) 4 Cal.3d 633, 639 et seq. . . .;
 
 Ayres
 
 v.
 
 City Council of City of Los Angeles
 
 (1949) 34 Cal.2d 31, 41-42 . . .) and it may not be necessary for the county to acquire the land by eminent domain even if it is ultimately used for a public purpose. In order to state a cause of action for inverse condemnation, there must be an invasion or an appropriation of some valuable property right which the landowner possesses and the invasion or appropriation must directly and specially affect the landowner to his injuiy. [Citation.]” (10 Cal.3d at pp. 119-120. See also
 
 HFH, Ltd.
 
 v.
 
 Superior Court
 
 (1975) 15 Cal.3d 508, 513-518 [125 Cal.Rptr. 365. 542 P.2d 237] [cert. den. (1976) 425 U.S. 904 (47 L.Ed.2d 754, 96 S.Ct. 1495)]; and
 
 Trust of Three
 
 v.
 
 City of Emeryville
 
 (N.D.Cal. 1977) 430 F.Supp. 833, 839-841.)
 

 In
 
 Goldblatt
 
 v.
 
 Hempstead
 
 (1962) 369 U.S. 590 [8 L.Ed.2d 130, 82 S.Ct. 987], which is cited by the subdivider, the court followed
 
 Mugler
 
 v.
 
 Kansas
 
 (1887) 123 U.S. 623 [31 L.Ed. 205, 8 S.Ct. 273], where it had recognized, “The power which the States have of prohibiting such use by individuals of their property as will be prejudicial to the health, the morals, or the safety of the public, is not—and, consistently with the existence and safety of organized society, cannot be—burdened with the condition that the State must compensate such individual owners for
 
 *759
 
 pecuniary losses they may sustain, by reason of their not being permitted, by a noxious use of their property, to. inflict injury upon the community.” (123 U.S. at p. 669 [31 L.Ed. at p. 213], as quoted 369 U.S. 593 [8 L.Ed.2d 133].) The
 
 Goldblatt
 
 court continued, “This is not to say, however, that governmental action in the form of regulation cannot be so onerous as to constitute a taking which constitutionally requires compensation.
 
 Pennsylvania Coal Co.
 
 v.
 
 Mahon
 
 260 U.S. 393 (1922); see
 
 United States
 
 v.
 
 Central Eureka Mining Co.,
 
 [(1958) 357 U.S. 155 (2 L.Ed.2d 1228, 78 S.Ct. 1097)]
 
 supra.
 
 There is no set formula to determine where regulation ends and taking begins. Although a comparison of values before and after is relevant, see
 
 Pennsylvania Coal Co.
 
 v.
 
 Mahon, supra,
 
 it is by no means conclusive, . . . How far regulation may go before it becomes a taking we need not now decide, for there is no evidence in the present record which even remotely suggests that prohibition of further mining will reduce the value of the lot in question. Indulging in the usual presumption of constitutionality, ... we find no indication that the prohibitory effect of Ordinance No. 16 is sufficient to render it an unconstitutional taking if it is otherwise a valid police regulation.” (369 U.S. at p. 594 [8 L.Ed.2d at pp. 133-134].) The subdivider can find no solace in that case. It upheld an injunction against violation. of a regulation prohibiting excavating in what was the landowner’s submerged quarry.
 

 The subdivider relies upon a series of cases in which a governmental agency has undertaken inequitable zoning action as a prelude to, or in lieu of, public acquisition. (See
 
 Eldridge
 
 v.
 
 City of Palo Alto, supra,
 
 57 Cal.App.3d 613, 626-629;
 
 Peacock
 
 v.
 
 County of Sacramento
 
 (1969) 271 Cal.App.2d 845, 856-863 [77 Cal.Rptr. 391];
 
 Sneed
 
 v.
 
 County of Riverside, supra,
 
 218 Cal.App.2d 205, 209;
 
 Arastra Limited Partnership
 
 v.
 
 City of Palo Alto
 
 (N.D.Cal. 1975) 401 F.Supp. 962, 976-982 [vacated, set aside, and expunged (1976) 417 F.Supp. 1125];
 
 Dahl
 
 v.
 
 City of Palo Alto
 
 (N.D.Cal. 1974) 372 F.Supp. 647, 648-649. Note,
 
 Drakes Bay Land Company
 
 v.
 
 United States
 
 (1970) 424 F.2d 574, 584-586 [191 Ct.Cl. 389]; and Code Civ. Proc., § 1245.260 and former § 1243.1, added Stats. 1971, ch. 1681, § 1, p. 3607, repealed Stats. 1975, ch. 1275, § 1, p. 3409, operative July 1, 1976.) These cases all involve a situation where the public agency is seeking to condemn the property involved. Here there is only the imposition of new restrictions, and no threat of condemnation.
 

 In
 
 .U.S.
 
 v.
 
 3.66 Acres of Land, in Cty. and Cty. of S.F., etc.
 
 (N.D.Cal. 1977) 426 F.Supp. 533,
 
 Arastra, Bydlon
 
 and the
 
 Drakes Bay
 
 case were all distinguished. (426 F.Supp. at p. 535, fn. 2, and p. 536.)
 
 Klopping,
 
 
 *760
 

 Peacock
 
 and
 
 Sneed
 
 were all distinguished in
 
 HFH, Ltd.
 
 v.
 
 Superior Court, supra
 
 (15 Cal.3d at pp. 516 and 517, fn. 11). That case establishes that a zoning action which merely decreases the market value of property does not violate the constitutional provisions forbidding uncompensated taking or damaging. It upheld an order sustaining a demurrer to a cause of action seeking damages for inverse condemnation (15 Cal.3d at p. 518). We have seen that the adoption of the act itself gave no right to compensation. The conditions attached to the permit in this case cannot be treated as more serious than a change in zoning, and so no action is maintainable here on that score.
 

 Since the commission is authorized to determine whether a permit should issue for development after Februaiy 1, 1973, its actions are subject to judicial review under section 1094.5 of the Code of Civil Procedure. The act expressly so provides (§ 27424). Nevertheless, one w'ho is improperly denied a permit may not recover damages. The state and the commissioners are granted immunity by sections 818.4 and 821.2 of the Government Code, which provide that neither a public entity nor a public employee is liable for injury caused by the refusal to issue a permit if the entity or employee is authorized to determine whether the permit should be issued.
 
 (State of California
 
 v.
 
 Superior Court (Veta Company), supra,
 
 12 Cal.3d 237, 244-247.)
 

 The court properly granted the summary judgment. The subdivider’s principal complaint is that it was under-financed and overburdened with debt so that it could not, as stated by the trial judge, “weather the-storm.” In
 
 Klopping,
 
 the plaintiff Sarff, in a companion case, lost his property by foreclosure after he filed suit, as did the plaintiff here.
 
 [10]
 
 The court noted, “In the petition for hearing filed herein, it also appears that he seeks recovery for damages occasioned by the fact that his property was ultimately foreclosed because the condemnation resolution prevented him from deriving income from his land in order to make mortgage payments. The availability of this "element of damage can be more fully explored on remand.” (8 Cal.3d at p. 58.) There the loss of income was
 
 *761
 
 from threat of condemnation and he was adjudged entitled to compensation for that loss. Here the loss of income was not occasioned by a threat of taking the subdivider’s lots, but by public uncertainty as to the terms on which development would be permitted throughout the whole coastal area. We have held that such uncertainty was properly resolved, and that the subdivider is barred from complaining about the conditions under which it was resolved by failure to pursue his administrative remedies. Were we to find otherwise, and face the question posed in
 
 Klopping,
 
 it is apparent that the measure of damages occasioned by the application of conditions to a property owner’s use of his property should not vary with the equity the property owner has in his land or his financial ability to forego its economic use for a time.
 

 The judgment is affirmed.
 

 Elkington, J„ and Lazarus, J.,* concurred.
 

 Appellant’s petition for a hearing by the Supreme Court was denied January 4, 1978.
 

 [1]
 

 The order is nonappealable, but its correctness is reviewed on the appeal from the judgment. (See 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 59, pp. 4074-4075.)
 

 [2]
 

 Plaintiff claimed total damages of $3,935,800, consisting of the following: 126 single family lots in unit 5 " $1,215,000 Multiple residential portion of unit 5 1,044,000 174 lots in unit 6 1,044,000 Multiple residential portion of unit 6 290,700 Interest paid on purchase price, note and deed of trust 21,000 Real estate taxes 70,000 Payments on assessment district bonds 85,000 Payments for water district improvements 3,500 Premium on performance bond 7,500 Advertising expense 12,000 Engineering and other expense 18,100 Improvements 125,000
 

 [3]
 

 In earlier proceedings in the same case the court had overruled the state’s demurrer to the subdivider’s complaint. The facts'established on the motion for summary judgment are substantially as alleged in the complaint.. It claims that the court erred in failing to apply the same principles in ruling on the motion for summary judgment. The case is governed by
 
 Timm
 
 v.
 
 McCartney
 
 (1935) 9 Cal.App.2d 230 [49 P.2d 315], where in response to a similar contention the court stated: “It is a somewhat common occurrence for a trial court to change its rulings upon questions of law during the progress of a trial, and a ruling on demurrer occupies no better position in this regard than any other ruling from which an appeal cannot be taken.
 
 (De La Beckwith
 
 v.
 
 Superior Court,
 
 146 Cal. 496 . . .)” (9 Cal.App.2d at p. 232. See also
 
 Vertex Inv. Co.
 
 v.
 
 Schwabacher
 
 (1943) 57
 
 *742
 
 Cal.App.2d 406. 409 [134 P.2d 891]: 1 Witkin, Cal. Procedure (2d ed. 1970) Courts. § 165, p. 434 and 3
 
 id.
 
 (1971) Pleading. § 836, p. 2443.)
 

 [4]
 

 So far as appears from the record no application was ever made to exempt the development of unit 6 from the coastal act (§ 27404), or to secure a permit for its development as provided in the act (§§ 27400-27403). In fact, the right to subdivide under the tentative map expired in August 1973 because the subdivide! had no funds to do the necessary engineering work for final approval. Any claim for the taking of that property is subject to all, if not more, of the infirmities attendant to the claim for the taking of the unsold lots in units 3, 4 and 5. Since no-lots were available, it could in no event be said that the coastal act or the regional commissioner prevented the sale of that land bv imposing improper conditions on the construction of single family dwellings. It was ostensibly marketable to anyone who wished to assume the additional development expense attendant to securing a permit under the coastal act.
 

 [5]
 

 Section 27402 provides: “No permit shall be issued unless the regional commission has first found, both of the following: [¶] (a) That the development will not have any substantial adverse environmental or ecological effect. [¶] (b) That the development is consistent with the findings and declarations set forth in Section 27001 and with the objectives set forth in Section 27302. [¶] The applicant shall have the burden of proof on all issues.” Section 27001 states: “The people of the State of California hereby find and declare that the California coastal zone is a distinct and valuable natural resource belonging to all the people and existing as a delicately balanced ecosystem; that the permanent protection of the remaining natural and scenic resources of the coastal zone is a paramount concern to present and future residents of the state and nation: that in order to promote the public safety, health, and welfare, and to protect public and private property, wildlife, marine fisheries, and other ocean resources, and the natural environment, it is necessary to preserve the ecological balance of the coastal zone and prevent its further deterioration and destruction: that it is the policy of the state to preserve, protect, and. where possible, to restore the resources of the coastal zone for the
 
 *750
 
 enjoyment of the current and succeeding generations; and that to protect the coastal zone it is necessary: [1] (a) To study the coastal zone to determine the ecological planning principles and assumptions needed to ensure conservation of coastal zone resources. [1] (b) To prepare, based upon such study and in full consultation with all affected.govemmental agencies, private interests, and the general public, a comprehensive. coordinated, enforceable plan for the orderly, long-range 'conservation and management of the natural resources of the coastal zone, to be known as the California Coastal Zone Conservation Plan. [II] (c) To ensure that any development which occurs in the permit area during the study and planning period will be consistent with the objectives of this division. [11] (d) To create the California Coastal Zone Conservation Commission, and.six regional coastal zone conservation commissions, to implement the provisions of this division.” Section 27302 reads: “The coastal zone plan shall be consistent with all of the following objectives: [¶|] (a) The maintenance, restoration, and enhancement of the overall quality of the coastal zone environment, including, but not limited to, its amenities and aesthetic values. [¶] (b) The continued existence of optimum populations of all species of living organisms. [¶] (c) The orderly, balanced utilization and preservation, consistent with sound conservation principles, of all living and nonliving coastal zone resources. [¶] (d) Avoidance of irreversible and irretrievable commitments of coastal zone resources.” Section 27403 requires, “All permits shall be subject to reasonable terms and conditions in order to ensure: [¶] (a) Access to publicly owned or used beaches, recreation areas, and natural reserves is increased to the maximum extent possible by appropriate dedication. [¶] (b) Adequate and properly located public recreation areas and wildlife preserves are reserved. [¶] (c) Provisions are made for solid and liquid waste treatment, disposition, and management which will minimize adverse effects upon coastal zone resources. [¶] (d) Alterations to existing land forms and vegetation, and construction of structures shall cause minimum adverse effect to scenic resources and minimum danger of floods, landslides, erosion, siltation, or failure in the event of earthquake.”
 

 [6]
 

 According to the subdivider, at that point in time it was in arrears on principal and interest payments on the promissory note secured by the deed of trust on its land, and the note holders were threatening foreclosure: it was in arrears in principal and interest payments due on assessment district bonds, and the bondholders were filing foreclosure notices: it was in arrears in the payment of its real property taxes; and there remained to be constructed and paid for in excess of $175,000 street improvements in unit 5.
 

 [7]
 

 The subdivider, who then was no longer.before the regional commission, contends that he could not have dedicated the requested easement, because a part of it was in unit 4. and the lots had been sold in. that unit on the basis that a portion of the easement requested by the commission for a public trail had been designated as a private road, and because the remainder of the easement in unit 4 was across two lots in which the subdivider had no interest. The rest of the requested easement apparently lay in proposed unit 6 which was encumbered by a deed of trust. The subdivider contends the concurrence of the beneficiaries tinder the deed of trust would have been necessary. The minutes of the meeting of September 6. 1973, however, report the subdivider as stating he had conceded the bluff-top access.
 

 [8]
 

 These conditions spelled out in detail the responsibilities of the property owners’ association, and limited the liability of any lot for the maintenance of the common lands
 
 *753
 
 to $30 per year. They limited the responsibility of the lot owners’ for the requested easement to so much as traversed common lands, but they gave notice that the development of further lands would entail an additional dedication by the subdivider.
 

 [9]
 

 We refrain from taking judicial notice, as requested by the state, that permits have been issued on 17 lots in units 3. 4 and 5. because such data was not before the trial court. The record itself, however, reflects that the commission had consistently modified its stand in order to find an accommodation between the views of the lot owners and the obligation of the commissioners to protect the environment during the moratorium period.
 

 [10]
 

 The record shows that on June 21, 1974, after the complaint was filed in this action, the trustee under a deed of trust' encumbering a part of the subdivider's property, exhausted the power of sale under the deed of trust and sold the property at auction. The subdivider claims the loss of the proposed lots in unit 6 in the sum of $1.334.700. and 32 single family lots in unit 5 in the sum of $600.000. On August 29. 1975. a declaration in opposition to the motion for summary judgment alleges that pending proceedings to foreclose the lien of the special assessment bonds has occasioned the loss of the $800,000 value of 47 lots, because the subdivider is unable to pay the $300.000 necessary to . redeem. See also footnotes 4 and 6.