[Civ. No. 8584. First Appellate District, Division One.—February 1, 1933.]

NARCISO F. BALDOCCHI et al., Appellants, v. FOUR FIFTY SUTTER CORPORATION (a Corporation), Respondent.

[Civ. No. 8585. First Appellate District, Division One.—February 1, 1933.]

NARCISO F. BALDOCCHI et al., Respondents, v. FOUR FIFTY SUTTER CORPORATION (a Corporation), Appellant.

384

Theodore J. Savage for Plaintiffs and Appellant.

Hartley F. Peart and Sylvester J. McAtee for Defendant and Appellant.

WOODWARD, J., *pro tem.*—Defendant Four Fifty Sutter Corporation appeals from a judgment granting plaintiffs a writ of injunction with damages, while plaintiffs separately appeal from a portion of the same judgment on the ground of inadequacy of relief. At the suggestion of counsel we shall consider the appeals together and, in order to avoid confusion, will refer to the parties as plaintiffs and defendant.

Stripped of technical minutiae, the controversy involves the restoration of a sidewalk and the relative rights of the parties thereto. The factual background of the litigation may be sketched as follows: During the year 1912 plaintiffs erected a five-story apartment house in the city of San Francisco, said structure having a frontage on Bush Street of 57 feet and 6 inches and on Chelsea Place, a public alleyway, of 104 feet and 6 inches. Contemporaneously therewith they constructed a four-foot sidewalk along the entire westerly side of Chelsea Place from Bush Street to what is now defendant's property line at the end of the alley. This sidewalk provided the only entrance to plaintiffs' strip of land situate south of the building, which area, referred to as "lot B", has a frontage of ten feet on Chelsea Place and extends westerly approximately 57 feet. Until the occurrence of the acts charged against the defendant, plaintiffs' tenants, including a number of women and children, used said "lot B" for recreational purposes. The defendant acquired property on the north side of Sutter Street,

between Powell and Stockton Streets, and, during the month of December, 1927, notified plaintiffs of its intention to erect a large garage and office building. Plaintiffs were informed that the building operation contemplated would necessitate a foundational excavation 70 feet in depth, and they were advised, as coterminous owners, to protect their building by underpinning the exposed walls. This plaintiffs proceeded to do at a cost of $15,700, employing for that purpose defendant's general contractors, Lindgren & Swinerton. While the walls of plaintiffs' apartment house were being underpinned and defendant's lot excavated, plaintiffs' strip in the rear of the apartment house and a large portion of the sidewalk referred to were damaged. After the completion of the office building plaintiffs filed suit alleging, among other things, that defendant had failed and refused to restore either the pavement or sidewalk to its former condition.

Defendant's appeal is largely concerned with questions of fact. Before discussing the points relied on for reversal, we will set forth the substance of the trial court's findings. The court determined that plaintiffs had certain private easements in front of and adjacent to their lot, among them being the right of ingress and egress to and from said lot and every part thereof over and by means of Chelsea Place, and that they also had the right to have the street space kept open; that, after defendant had completed its building and undertaken, through its general contractors and agents, to restore and reconstruct the street and sidewalk of Chelsea Place, it neglected to restore the area to its original condition; that it restored the sidewalk to its former width from Bush Street to a point southerly 81 feet, but from that point to the northeasterly corner of "lot B" it tapered said sidewalk gradually until it was but one foot in width at said corner; that all the rest of the area of Chelsea Place, including all the portion south and east of the line described, formerly occupied by said sidewalk, the defendant paved in such a manner that the area formed a part of the roadway of Chelsea Place for vehicular travel; that the scheme of restoration, as thus effected, was without the consent and against the will of plaintiffs, and was also without authorization from the board of public works of the city and county of San Francisco; that with the side-

walk space in front of "lot B" thus paved as a roadway, plaintiffs and their tenants could not safely enter or leave said "lot B" by means of a sidewalk, but would have to cross a portion of the vehicular roadway and expose themselves to the hazards of traffic; that the acts of defendant in depriving plaintiffs of their sidewalk constituted a nuisance; that damage had accrued to plaintiffs in the aggregate sum of $1,000 and that plaintiffs would continue to be damaged in the sum of $50 per month until the abatement of said nuisance.

It thus appears from the findings, which we have paraphrased, that when Chelsea Place was restored by defendant, plaintiffs found themselves in a disadvantageous position. The sidewalk in front of their building, beginning at a point approximately 28 feet south of their Chelsea Place entrance and ending at the northeasterly corner of their "lot B", had not been restored to its former width of four feet, but had been tapered along a straight line between the two points. No sidewalk at all had been constructed in front of "lot B", the space formerly occupied by such sidewalk having been utilized to widen the street in front of the entrance to defendant's garage.

Under the caption, "evidence does not support judgment", the defendant corporation urges that the judgment requires it to restore a sidewalk which the plaintiffs themselves destroyed. This view is predicated on evidence that plaintiffs employed Lindgren & Swinerton to shore up their walls and that in doing so the contractors damaged "lot B" and destroyed the sidewalk in front thereof. Notwithstanding plaintiffs' oral "understanding" with the contractors that the latter should restore the sidewalk, we believe the subtle distinction sought to be made between the rights and duties of the respective parties, because of their joint employment of Lindgren & Swinerton, is far-fetched. The evidence at least discloses that the defendant destroyed a portion of the said sidewalk pursuant to its building operations. But regardless of whether the sidewalk of "lot B" was destroyed by Lindgren & Swinerton as agents of the defendant, or as agents of the plaintiffs, the evidence discloses beyond all doubt that the plan, or "lay-out", as it was called by several of the witnesses, for restoring Chelsea Place was conceived and executed by the defendant. Narciso

Baldocchi, one of the plaintiffs, testified that he had no information or knowledge as to the details of this plan until the work had been completed. When he discovered, according to his testimony, that the defendant had paved a portion of the sidewalk space opposite the apartment house and all of the sidewalk space opposite "lot B", thereby widening the roadway, he immediately called upon the secretary of the Four Fifty Sutter Corporation and vigorously protested. Moreover, both plaintiffs made written demand upon the defendant and upon the contracting firm of Lindgren & Swinerton that the sidewalk be restored to its former condition. The only results of these protests, so Baldocchi averred, were persuasive attempts on the part of defendant corporation's secretary to induce plaintiffs to accept the scheme of restoration as executed. Then, too, Alfred Swinerton, a member of the contracting firm and a director in defendant corporation, testified that the entire work of reconstruction was done in behalf of, and paid for, by the defendant. We think, therefore, that defendant's point is without merit. ■ The defendant having essayed to invade plaintiffs' right by reconstructing Chelsea Place in accordance with its own plan—a plan clearly designed to eliminate the sidewalk formerly in front of "lot B" in order to widen the roadway and thus facilitate the moving of cars to and from the garage—it is in no position equitably to urge that plaintiffs destroyed their own sidewalk and hence should be denied relief. As a matter of fact, we entertain no doubt whatsoever that plaintiffs were entitled to equitable relief. ■ Anything which is an obstruction to the free use of property or which interferes with the comfortable enjoyment thereof, or unlawfully obstructs the free passage or use, in the customary manner, is a nuisance. (Civ. Code, sec. 3479.) ■ And it has been held that the property which an abutting owner has in the street in front of his land is an easement therein for the purposes of ingress and egress, which attaches to the lot, and in which he has a right of property as fully as that which he has in the lot itself. (*Brown* v. *Board of Supervisors*, 124 Cal. 274, 280 [57 Pac. 82].) Again, when the nuisance complained of is peculiar to the abutting owner, as distinguished from the public at large, and actual injury has been sustained, he is entitled to redress. (*Siskiyou Lumber etc. Co.* v. *Rostel*, 121

Cal. 511–514 [53 Pac. 1118]; *Harniss v. Bulpitt,* 1 Cal. App. 140–142 [81 Pac. 1022].)

Defendant's next contention is that there is no support in the evidence for the damages allowed plaintiffs. On this phase of the controversy Baldocchi testified, in part, as follows: "Q. You stated on your examination by counsel that the omission or absence of any sidewalk in portion of the former sidewalk in Chelsea Place, which I indicated on the plat in yellow, is $100.00 per month? A. I said approximately that. Q. Approximately? A. At least that. Q. Upon what do you base that computation or that estimate? That is wholly an estimate, is it not? A. Well, it has deprived us of the use of that lot for the apartment house; we have not been able to use it at all. Q. In other words, it is a conclusion on your part, isn't it, that the ten-foot strip was an attraction to the tenants in the apartment house? A. Well, it is not a conclusion. Mr. Flannery complained about it and complained on that account, he could not use it, and he figured was losing tenants by not being able to use it. Q. Isn't what Mr. Flannery complained of was the loss of the use of the ten-foot strip? A. That is correct, yes. Q. But how is it possible for you to make an estimate of damages of $100.00 per month? A. Because I had to reduce the rent over $250.00 at the time of the complaint. Q. Is that the only reason you can give for your estimate? A. Yes."

Basing their argument on the foregoing excerpt from the cross-examination of plaintiff, counsel for defendant ingeniously urge that the evidence affords no causal connection between the reduction of rent and the gravamen of the action. It seems to be defendant's position that plaintiffs, having sustained their damage through the shoring-up process of the apartment house, are in no position to attribute their loss to the improvement of Chelsea Place. It is true, of course, that plaintiffs would not be entitled to recover monetary damages proximately caused by their own acts. But we do not understand that the judgment was in any sense predicated on the temporary loss of "lot B", or the sidewalk in front thereof, *except in so far as said loss was made permanent by the defendant's own acts.* In this connection, it must be borne in mind that the complaint was based on the inaccessibility of "lot B", after the paving

project had been completed. It is true that Baldocchi's testimony to the effect that he allocated $100 of his rental loss to the absence of a sidewalk amounted to nothing more than a conclusion. The reduction of the rent, however, even though it occurred before the paving project was launched, was a fact. In these circumstances it would have been difficult for plaintiffs to prove their loss with mathematical exactitude. It apparently was their position that had it not been for the unwarranted acts of the defendant, they might eventually have restored "lot B" to its customary use and recovered some, if not all, of their rental loss. However that may be, the physical situation which confronted plaintiffs at the completion of the paving scheme, furnishes persuasive evidence that they had been damaged. Mrs. Helen Strong, manager of the apartment house, described this situation in a few words. According to her testimony, automobiles pass to and from the garage "every two or three minutes on an average". Because of the narrow street and the lack of sidewalk space it was, in her opinion, unsafe for children to play in "lot B". She testified further that the apartment house lost tenants because it lacked playground facilities. On the other hand, the court permitted George C. Taggart, apartment house broker, to testify as an expert, that the rental value of the apartment house had not decreased as a result of the paving and reconstruction plan. The court, while doubtless appreciating the fact that the proof of monetary damage was not as satisfactory as could be desired, determined that plaintiffs were entitled at least to a portion of the amount claimed. The court heard the testimony and visited the premises. We cannot say from all the facts and circumstances of the case that its finding on the question of monetary damage was without support in the evidence. It is not suggested that the amount of damages awarded plaintiffs is excessive.

 Lastly, defendant assails the court's finding to the effect that defendant failed to obtain a permit from the board of public works for the reconstruction of Chelsea Place. Except as bearing on the good faith of defendant, this question appears relatively unimportant. The evidence discloses that the defendant on July 18, 1929, made application to the board of public works for permission to reconstruct the area in question. The application was accom-

panied by a blue-print, showing the changes proposed to be made in the curb lines. The application was referred as a matter of routine to the city engineer, who, in due time, issued a blue-print which contained certain modifications of the plan as originally proposed, including provision for proper drainage. Without further authorization from the city, Lindgren & Swinerton thereupon proceeded to make the improvements in question. Our attention is not called to any section of the San Francisco charter which authorizes the city engineer to issue permits for the doing of street work. On the contrary, we conclude from the numerous sections of said charter cited by plaintiffs that he possessed no such authority. It may be reasonably inferred from the evidence that the city engineer, at the time he issued the blue-print, concluded that a formal permit from the department of public works had been, or would be, issued. In this connection the testimony of Clyde Healy, second assistant city engineer, is significant. He testified that he advised Mr. Swinerton that the scheme of reconstruction was feasible "provided the property owners on both sides were agreeable to it, for the reason he was asking for improvements not in front of his property but in front of property of other owners, and the only legal way I could do that was refer it to the Board of Supervisors". We feel that defendant's point is without merit. The issuance of a blue-print by the city engineer under the circumstances narrated was not tantamount to obtaining permission from the proper authorities. There is no evidence, however, that the defendant acted in bad faith.

Because of the views hereinabove expressed, we do not feel it necessary to discuss, although we have carefully considered, the other factual points urged by the defendant. The judgment granting plaintiffs a mandatory and prohibitory writ of injunction with damages is amply supported by the evidence, and it is our opinion that it should not be disturbed.

Turning now to plaintiffs' appeal from a portion of the judgment:

The judgment directs the restoration of plaintiffs' sidewalk along the entire westerly line of Chelsea Place to its former width with one exception. Avoiding a technically exact description, this exception may be condensed in the

following language: Beginning at a point four feet from the end of the alleyway, which is a cul-de-sac, defendant, in replacing said four-foot sidewalk, is permitted to construct the curb diagonally, or on a straight line, to the southeast corner of "lot B", thus excluding from the former sidewalk area a triangular paved segment containing eight square feet.

Plaintiffs contend that the portion of the judgment appealed from constitutes a denial to them of the full measure of relief to which they were entitled under the law and the evidence. The effect of the court's action, of course, was to refuse plaintiffs a mandatory injunction requiring defendant to restore the southerly four feet of the sidewalk to its former condition. Scrutiny of the physical surroundings, as disclosed by the evidence, makes the reason for the court's determination easily understood. Defendant's large building is used in part for storing automobiles with a public entrance at the southerly end of Chelsea Place. Due to the narrow street, which is but 20 feet wide inclusive of sidewalk space, and the presence of large supporting. columns a short way within said entrance, it is necessary for automobiles to be turned slightly to the right in order to negotiate the driveway. Defendant's whole plan for reconstructing Chelsea Place seems to have been designed to meet the exigencies of this situation.

In support of the judgment, defendant, after citing its space restrictions and the concomitant difficulty of utilizing this driveway, seeks to invoke the equitable doctrine known as the balancing of conveniences. We do not deem it necessary to set forth this doctrine with its manifold variations and ramifications. Suffice it to say that, whatever may be the refinements of the rule in other jurisdictions, the courts of California, especially with reference to the issuance of mandatory or perpetual injunctions, frown upon the doctrine. For example, in the case of *Hulbert* v. *California etc. Cement Co.*, 161 Cal. 239, 249 [118 Pac. 928, 932, 38 L. R. A. (N. S.) 436], the Supreme Court, after discussing various phases of the rule, as declared in other jurisdictions, asserts that "none of them, nor all of them, can be authority for the proposition that equity, a case for its cognizance being otherwise made out, will refuse to protect a man in the possession and enjoyment of his property because that right

is less valuable to him than the power to destroy it may be to his neighbor or to the public". And it seems to be the rule in all jurisdictions that the doctrine has no application where the act complained of is of a tortious character and when the balancing of conveniences extinguishes a valuable vested right. In the case of *Felsenthal* v. *Warring*, 40 Cal. App. 119, 129 [180 Pac. 67, 71], the court declares: "The rule that a chancellor will refuse to enjoin when greater injury will result from granting than from refusing an injunction has no application where the act complained of is in itself, as well as in its incidents, tortious. In such case it cannot be said that injury would result from an injunction, for no man can be heard to say that he is injured by being prevented from doing to the hurt of another that which he has no right to do. When a suitor has brought his cause clearly within the rules of equity jurisprudence, the relief he asks is demandable *ex debito justitiae,* and needs not to be implored *ex gratia."* (Long list of authorities cited.)

While courts of equity will not balance the inconvenience of a tortious wrongdoer against one whose rights have clearly been infringed upon, it is nevertheless incumbent upon one who seeks a mandatory injunction to show that the wrong complained of has resulted, or will result, in a substantial injury. The injury, it is true, may be only slight, but it must be real and ascertainable as distinguished from fanciful and imaginary. "When an injunction to restrain a nuisance will produce great public or private mischief, a court of equity is not bound to grant it merely for the purpose of protecting a technical unsubstantial right." (*Frost* v. *City of Los Angeles,* 181 Cal. 22, 31 [183 Pac. 342, 346, 6 A. L. R. 468].) "Consequently," declares the Supreme Court in the case of *Thompson* v. *Kraft Cheese Co.,* 210 Cal. 171, 179 [291 Pac. 204, 208], "if an injunction is given, it must be directed against only those acts which cause some material injury to plaintiffs."

The decision of *McKean* v. *Alliance Land Co.,* 200 Cal. 396–399 [253 Pac. 134], is peculiarly applicable to the facts of the present controversy. In that case plaintiffs and defendants were adjoining owners of real property and the former claimed that the latter's building encroached upon their lot from one-half to five-eighths of an inch. The trial

court refused to order removal of the encroachment on the ground that there was no evidence that the same caused any actual damage to plaintiffs. Instead, the court gave plaintiffs judgment for $10, holding that this nominal sum would afford full, complete and adequate relief. The Supreme Court, in affirming the case, declared that in view of the fact that there was no evidence of actual damage to plaintiffs, "the award of the trial court is both wise and just".

In the foregoing case the encroachments were actually on the freehold of the plaintiffs. In the present case the plaintiffs, if we correctly apprehend their pleadings, claim only an easement to the area involved—an easement also enjoyed by the defendant since the four feet of sidewalk at the end of Chelsea Place fronts also upon its property. The gravamen of plaintiffs' action was that they had been deprived of the use of "lot B" by reason of the defendant's acts. The judgment, we think, affords full, complete and adequate relief to plaintiffs. As already pointed out, the sidewalk must be restored to its original width to a point four feet north from defendant's property line. This will afford plaintiffs the full use of "lot B". They will have a sidewalk from Bush Street to the southerly end of their property, the only difference being that the last four feet of said sidewalk will be diminished in width. In going to and from "lot B" it will not be necessary for plaintiffs or their tenants to step into the street and thus be exposed to the hazards of traffic. The slight change in the curb line, permitted by the trial court, is not an appropriation by defendant of plaintiffs' property. The small area involved has been paved as a part of the roadway to facilitate the moving of automobiles to and from the garage. The trial court undoubtedly concluded that, even assuming that plaintiffs had an easement to said area as sidewalk space, they could not be damaged by being deprived thereof in the manner described. If the full and unrestricted use by plaintiffs of "lot B" required the extension of a four-foot sidewalk beyond the point involved, an entirely different situation would obtain. In that event, regardless of the resultant inconvenience to defendant, the court doubtless would have granted the relief as prayed for. The trial court, it appears, concluded that the defendant, in executing its plan for the restoration of Chelsea Place, acted in good

faith but under a mistaken conception of its legal rights. The court likewise concluded that plaintiffs were insisting partly on technical and unsubstantial rights, the loss of which had not, and could not, cause them any injury whatsoever. We see no reason for disturbing the judgment.

The findings in some respects appear deficient, but since our attention is not called to any of these deficiencies, and since counsel for the respective parties concede in their briefs that the court had jurisdiction to determine the entire controversy, we see no occasion to discuss the matter.

For the reasons herein stated the judgment as appealed from both by the plaintiffs and by the defendant is affirmed.

Knight, Acting P. J., and Cashin, J., concurred.

An application by petitioner to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 30, 1933.