Opinion
 

 STANIFORTH, J.
 

 We confront here the single issue of whether Helix Land Company (Helix), owners of land in the Tia Juana River Valley, can state a cause of action in inverse condemnation or nuisance against defendants City of San Diego, its counsel and certain of its officers (City),
 
 *937
 
 and/or the State of California, its Secretary of the Resources Agency and Director of State Parks (State) for their various actions or inactions in land use control which, Helix argues, resulted in the deprivation of
 
 all
 
 economic use of their property.
 

 Helix’s 13-count complaint sought damages and equitable relief from defendants on a variety of legal premises. General demurrers to all counts were sustained without leave to amend. On appeal, Helix has “elected to proceed” on inverse condemnation and nuisance theories only.
 

 Facts
 

 We assume for purposes of this proceeding the truth of any properly pleaded factual allegations contained in the complaint.
 
 (Serrano
 
 v.
 
 Priest,
 
 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241].) However, since the demurrers were sustained without leave to amend, we consider other relevant matters of which the trial court could have taken notice. (Evid. Code, § 452.) Where a demurrer is sustained without leave to amend, we may treat such matters if relevant as having been pleaded.
 
 (Weil
 
 v.
 
 Barthel,
 
 45 Cal.2d 835, 837 [291 P.2d 30].)
 

 The facts detailed in the pleading, as well as those which we judicially notice, are: Helix is the owner of substantial lands in the Tia Juana River Valley adjacent to the Mexican border. In 1944 the United States entered into a treaty with the Republic of Mexico calling for the construction of a flood control channel in Mexico and the United States to drain the flood waters of the Tia Juana River safely into the Pacific Ocean. In 1962 a public hearing was held in San Diego where interested state agencies expressed concurrence with that project. In 1964 the Governor of the State of California wrote to the International Boundary and Water Commission concurring in the finding there was an urgent need for that project. In 1968 the Legislature of the State of California enacted California Water Code sections 12744-12744.2 providing for state funding for the acquisition of rights of way for such a flood control project.
 

 The state Legislature by Concurrent Resolution No. 65 (adopted November 2, 1971), proposed a re-evaluation of land use in the Tia Juana River Valley. In July 1972 the Resources Agency of the State of California in response to resolution No. 65 issued its “Review of Land Uses in the Tia Juana River Valley” in which it was recommended:
 

 
 *938
 
 “1. ‘Estuarine and parklands designated in Exhibit C of this Report be acquired for public use.’
 

 “2. ‘The State explore all alternatives for public acquisition of lands designated in Exhibit C including:
 

 a. Corps of Engineers acquisition of all or a portion of the flood plain.
 

 b. Inclusive in area of Parks and Recreation budget.
 

 c. Special State appropriation.
 

 d. Personalized license plate funds.
 

 e. Land and water conservation funds.’
 

 “3. ‘That the City of San Diego, County of San Diego and City of Imperial Beach be solely responsible to develop the studies and information necessary for the evaluation of alternatives of land use and flood control in the lower Tijuana River Basin; and that such studies will incorporate the concepts of proposed land uses prescribed by the Department of Parks and Recreation and the Department of Fish and Game in their respective plans and reports which concern the California Resources Agency’s interest within the Tijuana River Basin.’ ”
 

 This report was filed with the Legislature and the Resources Agency was then instructed to prepare a final report based on the content, conclusions and recommendations of its preliminary report. The final report containing the same recommendation was filed with the Legislature by the Resources Agency in December 1972.
 

 The preliminaiy and final reports of the State Resources Agency called for “Development and Analysis of Feasible Alternatives to the Proposed Concrete Line Channel.”
 

 The state further caused to be published as part of its official publication “1974 Park Bond Act—Projects Recommended for Acquisition and Development.” The Helix properties were listed as a number two priority acquisition proposed to be purchased with funds from the bond act. On June 8, 1974, the voters of the state approved the 1974 bond act (proposition 1). More recently, Helix properties have been appraised by the State.
 

 
 *939
 
 Paralleling this activity of the state, Helix charges the City and its agency with these acts: The Helix lands were annexed to the City in 1957. That same year the City placed the Helix lands with other newly annexed property into an interim agricultural zone classification (Ordinance No. 7606, new series). Fifteen years later the interim designation was removed (Ordinance No. 10862, new series, adopted July 29, 1972) and the agricultural classification (A-1-10) became the permanent zoning.
 

 In addition, the City adopted ordinances establishing floodway (FW) and flood plain fringe (FPF) zones. (San Diego Municipal Code, §§ 101.0403, 101.0403.1 and definitions in §§ 101.0101.57 through 101.0101.61.) These flood zone classifications have not yet been applied to Helix’s lands.
 

 Helix asserts the actions of the City in adopting these zoning ordinances were taken to preclude any economic use of plaintiffs’ property; their sole purpose was to depreciate the value of plaintiffs’ property in order to be later acquired at drastically depressed prices for greenbelt, open-space, park, recreational or other public purposes.
 

 Helix alleged their property has been, since before 1959, and is now totally unsuited for agricultural purposes because of salt water intrusion: by reason thereof any economic agricultural use of plaintiffs’ property is impossible. By the City’s continuing Helix’s property in the A-1-10 zone, Helix is “totally precluded” from being able to make any productive use of their property.
 

 The complaint further alleged, pursuant to the 1944 treaty, various negotiations, resolutions, commitments and agreements were made by which City, State, the United States and the Republic of Mexico agreed to construct adequate flood control facilities.
 

 In 1964, the United States Army Corps of Engineers proposed a trapezoidal concrete flood control channel of overall width of 670 feet and 5.5 miles in length from the Mexican border to the Pacific Ocean. A similarly designed channel was agreed to be built in Mexico by the Republic of Mexico to connect at the international border with the coordinated United States project. Funding for the United States project was approved by both Congress and State. City declared its intention to participate in the funding for the channel. Following these commitments and agreements, Mexico proceeded and has completed (excepting the last 400 meters) a concrete flood control channel which leads directly to and
 
 *940
 
 empties across the international border at the site of the proposed dissipator channel.
 

 After these agreements, and the actual construction by Mexico, the following events occurred with respect to the Tia Juana River Valley Flood Control Project in which the United States, City and State were actors, co-participants.
 

 In response to Assembly Concurrent Resolution No. 65 (Nov. 2, 1971) and a draft environmental impact statement prepared by the United States Army Corps of Engineers, the City reevaluated its land use plans for the Tia Juana River Valley and at that time requested the United States Army Corps of Engineers (the design agency for the International Boundaiy Water Commission—a federal agency under the United States Secretaiy of State) to reevaluate the design for the flood control channel. The Corps of Engineers responded and provided alternative design plans. This new design, known as the dissipator dike structure, was endorsed by City as the most preferable. Congress approved the modified flood control structure and then President Ford signed the amended federal statute. The Mexican government, through its commissioner, endorsed the modified design and a minute order (amendment to the treaty) has been entered into between the Mexico section of the International Boundaiy and Water Commission and the United States section of the International Boundary and Water Commission approving the modified design.
 

 Helix concludes from these acts City, in cooperation with officials of State, “torpedoed” the United States’ participation in the concrete-lined channel project, specifically by the unilateral rescission of its prior agreements and by its refusal to carry out its “statutory obligations” to acquire rights-of-way necessaiy to the construction of the flood control channel.
 

 Helix charges as a result of these actions and nonactions, the construction of the concrete-lined channel on the United States’ side of the border has been prevented. Flood waters will now be diverted by the completed Mexican channel and will flow into the United States thereby subjecting Helix’s property to a far greater threat of flooding than theretofore existed. Moreover, they assert their property will be subjected to raw and untreated sewage and other chemicals and substances injurious to the health of plaintiffs and to their lands.
 

 
 *941
 
 The complaint alleges damages in these terms: “As a consequence of the matters hereinafter set out, the fair market value and potential for development of said property has been substantially reduced” and “has been taken or damaged or both ... in an amount of $25,724,500.00.” Plaintiffs allege they “have suffered damages and loss in fair market value of the land in the sum of $25,724,500.00 less such values remaining in the lands when conforming to open space and flood plain. . . .”
 

 Issues
 

 We now examine Helix’s major contention that a cause of action for inverse condemnation was stated under
 
 Eldridge
 
 v.
 
 City of Palo Alto,
 
 57 Cal.App.3d 613 [129 Cal.Rptr. 575], and in
 
 HFH, Ltd.
 
 v.
 
 Superior Court,
 
 15 Cal.3d 508 [125 Cal.Rptr. 365, 542 P.2d 237], In
 
 HFH, Ltd., supra,
 
 the California Supreme Court declared inverse condemnation does not lie for zoning actions in which the only alleged effect is a mere reduction in market value.
 
 (Id.,
 
 at p. 513.) Consequently, it was held that the trial court correctly sustained a demurrer
 
 to
 
 a complaint which alleged that as the result of zoning plaintiff’s land was reduced in value from $400,000 to $75,000.
 
 (Id,
 
 at pp. 512-518; see also
 
 Brown
 
 v.
 
 City of Fremont,
 
 75 Cal.App.3d 141 [142 Cal.Rptr. 46].)
 

 In
 
 Eldridge
 
 v.
 
 City of Palo Alto, supra,
 
 57 Cal.App.3d 613, plaintiffs were the owners of 772 acres of unimproved lands above the City of Palo Alto. Following annexation in 1959 to the City of Palo Alto, Eldridge’s lands were zoned single family dwelling with minimum one-acre sites. Thereafter a regulation was adopted which designated the area as “open space use” permitting no less than a 10-acre site per house; all such sites were to be subject to “open space uses.” The
 
 Eldridge
 
 court held plaintiffs, who had alleged that they were denied
 
 any substantial or reasonable use
 
 of their property as a result of an ordinance rezoning such property “permanent open space and conservation lands,” had stated a cause of action for inverse condemnation sufficient to withstand demurrer.
 
 (Id.,
 
 at
 
 pp.
 
 628-629.)
 

 The Court of Appeal refused to dismiss the demands for just compensation holding many factual issues remained to be resolved including whether the 10-acre homesites would be reasonable at all and the reasonableness of the concept that such homesites, without compensation, must remain open space.
 

 
 *942
 
 Factually,
 
 Eldridge
 
 is distinguished from Helix’s complaint by (a) charges of actual down zoning from one-acre usage to a ten-acre open space zoning and (b) this down zoning was concurrent with activities aimed at protecting and preserving the open space character of Eldridge’s land for park and recreation purposes.
 

 The
 
 Eldridge
 
 complaint charges the City Council of Palo Alto sought alternative ways to achieve an “open space” objective in the surrounding foothills. It amended its general plan so as to designate the uses for the area as “ ‘open space, conservation and/or parks.’ ” (57 Cal.App.3d at p. 622.) It initiated studies to explore methods of achieving this objective “ ‘other than by acquisition.’ ”
 
 (id.)
 
 The ordinance states that its purpose is to “ ‘protect and preserve [such] open space land’ ” for, among other things, “ ‘public recreation’ ” purposes.
 
 (Id.,
 
 at p. 624.) Among the issues of fact which the court in
 
 Eldridge
 
 held remained to be decided, were whether plaintiff's’ parcels were salable at all in view of the fact that the same areas designated as homesites were also designated by the ordinances for “ ‘open space’ ” use, including use for public park and recreation purposes, public paths and trails through their property, and “ ‘wildlife habitat.’ ”
 
 (Id.,
 
 at p. 628.)
 

 The allegations in
 
 Eldridge
 
 justify the conclusion the City of Palo Alto was attempting to use the method of “open space” zoning as a means of preserving and maintaining the land for public purposes thus circumventing the constitutional requirement of just compensation for any taking of private property for a public use.
 

 Eldridge
 
 falls squarely within the line of cases holding that public entities may not use their zoning power as a subterfuge to take land for public purposes without the payment of just compensation. (See
 
 Sneed
 
 v.
 
 County of Riverside,
 
 218 Cal.App.2d 205, 207 [32 Cal.Rptr. 318];
 
 Peacock
 
 v.
 
 County of Sacramento,
 
 271 Cal.App.2d 845, 854 [77 Cal.Rptr. 391];
 
 Kissinger
 
 v.
 
 City of Los Angeles,
 
 161 Cal.App.2d 454, 462 [327 P.2d 10].)
 

 City of Walnut Creek
 
 v.
 
 Leadership Housing Systems,
 
 73 Cal.App.3d 611, at pp. 619-620 [140 Cal.Rptr. 690], speaking of
 
 Eldridge
 
 stated: “We may summarily disregard
 
 Peacock, Sneed
 
 and
 
 Eldridge.
 
 In. each of those cases, unlike this case, there was a change in zoning which arguably was designed to obtain ends which the regulating governmental body was only entitled
 
 to
 
 obtain through paying fair compensation.”
 

 
 *943
 

 Eldridge
 
 was characterized in
 
 Frisco Land & Mining Co.
 
 v.
 
 State of California,
 
 74 Cal.App.3d 736, 759 [141 Cal.Rptr. 820], as one in a series of “cases in which a governmental agency has undertaken inequitable zoning action as a prelude to, or in lieu of, public acquisition.”
 

 Helix makes no factual allegations in the complaint demonstrating that the zoning ordinance or the flood plain zone classification were a properly-taking device rather than a regulation of the use of land. Rather, appellants’ complaint is similar to the one in
 
 Morse
 
 v.
 
 County of San Luis Obispo,
 
 247 Cal.App.2d 600 [55 Cal.Rptr. 710] (cited with approval by the Supreme Court in
 
 HFH, Ltd.),
 
 where the court stated: “On the question of a taking of their property for public purposes, Morse and Seal have failed to set out facts in their complaint to show that the ordinance was a property-taking device rather than a regulation of the use of land. They have sought damages of $1,066,000 for the rezoning of the general area in which they own land, but have pleaded no activity by the county or its agents from which a taking of their property for public use can be inferred. Absent any showing to the contrary, we are entitled to presume that the decision of the county to preserve the agricultural nature of the area and to deny an intensification of habitation near the airport was a reasonable exercise of the zoning power designed to prevent urban sprawl and to forestall the development of residential zones in areas of the county susceptible to excessive noise or above-average hazards.” (Id., at p. 603.)
 

 In
 
 Pinheiro
 
 v.
 
 County of Marin,
 
 60 Cal.App.3d 323 [131 Cal.Rptr. 633], the court affirmed an order sustaining a demurrer to an inverse condemnation complaint. The court said: “. . . although appellants allege that the zoning constitutes ‘acquisition for public use’ they present no allegations of facts indicating either acquisition
 
 or
 
 public use. They ‘have failed to set out facts in their complaint to show that the ordinance was a property-taking device rather than a regulation of the use of land.’ ” (Id., at p. 328.)
 

 In
 
 Brown
 
 v.
 
 City of Fremont, supra,
 
 75 Cal.App.3d 141, the facts are remarkably similar in many respects to Helix’s action. Most pertinent are the allegations which indicate that the subject property had been zoned for agricultural uses, that later a revised general plan for the city indicated the possibility of using the property for residential or industrial purposes, and that subsequently the city adopted a conservation and open-space element of the general plan which permitted only agricultural uses for the property. The court held there was no inverse condemnation
 
 *944
 
 and further held that
 
 “there is no requirement that property must be zoned so that a subdivider can develop the property for a higher economic use.” (Id.,
 
 at p. 147; italics added.) (See also
 
 Pan Pacific Properties, Inc.
 
 v.
 
 County of Santa Cruz,
 
 81 Cal.App.3d 244 [146 Cal.Rptr. 428].)
 

 If it be Helix’s theory that an inverse condemnation occurs by the making permanent of a temporary or interim agricultural zone classification or as a result of the failure of the City to rezone to a higher, less restrictive usage, then the Court of Appeal in
 
 Morse
 
 v.
 
 County of San Luis Obispo, supra,
 
 247 Cal.App.2d 600, speaks to the point. There the plaintiff sought damages in inverse condemnation for down zoning of their property.
 

 The
 
 Morse
 
 court stated: “Plaintiffs are apparently attempting to recover profits they might have earned if they had been successful in getting their land rezoned to permit subdivision into small residential lots, but
 
 landowners have no vested right in existing or anticipated zoning ordinances.
 
 [Citation.] A purchaser of land merely acquires a right to continue a
 
 use
 
 instituted before the enactment of a more restrictive zoning. Public entities are not bound to reimburse individuals for losses due to changes in zoning, for within the limits of the police power ‘some uncompensated hardships must be borne by individuals as the price of living in a modem enlightened and progressive community.’ [Citation.]”
 
 (Id.,
 
 at pp. 602-603.)
 

 The mere reduction in market value as a result of making permanent a temporary agricultural zone use does not give rise to a cause of action in inverse condemnation.
 
 (HFH, Ltd.
 
 v.
 
 Superior Court, supra,
 
 15 Cal.3d 508, 514;
 
 Selby Realty Co.
 
 v.
 
 City of San Buenaventura,
 
 10 Cal.3d 110, 127-128 [109 Cal.Rptr. 799, 514 P.2d 111].)
 

 Moreover, the adoption of a general plan with areas designated for acquisition cannot give rise to a claim for inverse condemnation.
 
 (Selby Realty Co.
 
 v.
 
 City of San Buenaventura, supra,
 
 p. 119;
 
 Pinheiro
 
 v.
 
 County of Marin, supra,
 
 60 Cal.App.3d at p. 325;
 
 Sierra Terreno
 
 v.
 
 Tahoe Regional Planning Agency,
 
 79 Cal.App.3d 439, 442 [144 Cal.Rptr. 776].)
 

 Here, Helix points to no down zoning, let alone discriminatory down zoning, no takings or threats of taking coupled with a delayed acquisition to bring this action within the
 
 Eldridge, supra,
 
 57 Cal.App.3d 613, rule. Rather, at a crux of Helix complaint is a continuance of the same agricultural zoning made permanent coupled with a failure to cany
 
 *945
 
 through with a flood control project favored by plaintiff. Helix’s attempts to recoup profits they might have made on anticipated up-zoning and benefit to their properties deriving from the original—but now abandoned—trapezoidal narrow flood channel.
 

 Pursuing our duty to examine the pleadings and judicially noticed matters to determine whether a cause of action is or is capable of being stated upon any legal theory, we note City has adopted as part of its land use program for the Tia Juana River Valley a floodway zone (FW) and flood plain fringe zone (FPF).
 
 Selby Realty Co.
 
 v.
 
 City of San Buenaventura,supra,
 
 states at pages 119-120 of 10 Cal.3d: “In order to state a cause of action for inverse condemnation, there must be an invasion or an appropriation of some valuable property right which the landowner possesses and the invasion or appropriation must directly and specially affect the landowner to his injury.” Before a compensable taking results, there must be (1) a physical invasion, or (2) a direct legal restraint.
 
 (City of Walnut Creek
 
 v.
 
 Leadership Housing Systems, supra,
 
 73 Cal.App.3d 611, 620.)
 

 Helix does not allege either the FW or the FPF zoning has been applied to its lands; therefore, under the
 
 Selby Realty Co., supra,
 
 and
 
 City of Walnut Creek, supra,
 
 rationale no cause of action is stated. If we assume what is contemplated will occur, these flood zone designations will be applied to Helix’s lands, still no liability arises in inverse condemnation. In
 
 Turner
 
 v.
 
 County of Del Norte,
 
 24 Cal.App.3d 311 [101 Cal.Rptr. 93], similar flood plain zoning was imposed in response to prospects of flooding. The appeal court held the protection of people and property from flooding by zoning restrictions a proper exercise of the police power.
 
 (Id.,
 
 at p. 315.)
 

 Nor do the pleadings charge that the flood zoning ordinance would change the course or increase the flow of flood waters over its land so as to constitute a flowage easement.
 
 (Turner
 
 v.
 
 County of Del Norte, supra,
 
 p. 315.) Speculation does not take the place of ultimate fact allegations; therefore no cause of action is stated for the taking of a flowage easement.
 

 The Helix complaint presents no allegation of precondemnation activities on the part of the City akin to
 
 Eldridge, supra,
 
 57 Cal.App.3d 613. Only as mist resembles rain do these general planning activities of the City and State approach the
 
 Eldridge
 
 facts. Secondly, there is no allegation of down zoning. The charge is the making permanent of a temporary agricultural zone; that the City has adopted flood plain zoning
 
 *946
 
 not yet made applicable to Helix’s property. Third, and most significant, there is no allegation of lack of remaining beneficial use in the land. Fourth, Helix does not allege a proximal relationship between the zoning activities and the City general planning for the area and any loss of use of their property. The inability to use for agricultural purposes is alleged to be due to
 
 natural causes.
 
 In summary, Helix fails to set out facts in their complaint to show that the activities of either defendant was a property-taking device rather than an unchallenged exercise of the police power.
 

 The heart of their charge is the City has torpedoed a flood control project that would have resulted in higher uses—zone classifications— available to their property. In short, they complain they will not get an anticipated windfall. Inverse condemnation damages are not made of such stuff.
 

 We conclude as to the City of San Diego, no cause of action is or can by amended pleading be stated. Neither
 
 Eldridge
 
 nor
 
 HFH, Ltd.,
 
 give life to Helix’s pleadings.
 

 Helix’s inverse condemnation claim against the State rests for legal foundation on
 
 Klopping
 
 v.
 
 City of Whittier,
 
 8 Cal.3d 39 [104 Cal.Rptr. 1, 500 P.2d 1345]. In
 
 Flopping,
 
 the City of Whittier initiated condemnation proceedings against the plaintiff’s property. A year later, the city dismissed the action but declared its intention to take the same property in the future. Plaintiffs sued in inverse condemnation, charging the fair market value of their properties had declined as a result of the city’s announcement of its intention to condemn; there was a cloud over their property, and they had lost rentals as a result of the city’s conduct. The Supreme Court in
 
 Flopping
 
 ruled: “[A] condemnee must be provided with an opportunity to demonstrate that (1) the public authority acted improperly either by unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation; and (2) as a result of such action the property in question suffered a diminution in market value.”
 
 (Id.,
 
 at p. 52.)
 

 The general principles announced in
 
 Flopping,
 
 authorizing a damage award where inequitable zoning actions are taken by a public body as a prelude to public acquisition proximately resulting in a diminution of market value, has been subject to further definition and refinement in
 
 Selby Realty Co.
 
 v.
 
 City of San Buenaventura, supra,
 
 10 Cal.3d 110. There the Supreme Court in disposing of the inverse condemnation pleading
 
 *947
 
 said, “Insofar as this cause of action is based upon the adoption of the general plan, there is no ‘taking’ of the property.”
 
 (Id.,
 
 at p. 128.)
 

 Klopping
 
 factually involves inequitable condemnation acts directed towards a specific parcel of property. Said the
 
 Selby
 
 court, “Neither
 
 Klopping
 
 nor any other decision of which we are aware holds that the enactment of a general plan for the future development of an area, indicating potential public use of privately owned land, amounts to an inverse condemnation of that land.”
 
 (Selby Realty Co.
 
 v.
 
 City of San Buenaventura, supra,
 
 p. 119.) And the
 
 Selby
 
 court reasoning is precisely in point: “If a governmental entity and its responsible officials were held subject to a claim for inverse condemnation merely because a parcel of land was designated for potential public use on one of these several authorized plans, the process of community planning would either grind to a halt, or deteriorate to publication of vacuous generalizations regarding the future use of land.”
 
 (Id.,
 
 at p. 120.)
 

 In
 
 Smith
 
 v.
 
 State of California, 50
 
 Cal.App.3d 529 [123 Cal.Rptr. 745], the appeal court found no cause of action in inverse condemnation on the basis of the State Highway Commission’s adoption and public announcement of a proposed freeway route.
 
 Smith
 
 involved a seven-year delay after the announcement but held such facts did not result in an arbitrary invasion of any right of Smith and did not constitute a “taking” of Smith’s property.
 

 The
 
 Smith
 
 court observed at page 532: “The adoption of a general plan was said to be ‘several leagues short of a firm declaration of an intention to condemn property.’
 
 (Selby, supra,
 
 at p. 119.)”
 

 And in
 
 City of Walnut Creek
 
 v.
 
 Leadership Housing System, supra,
 
 73 Cal.App.3d 611, 622-623, the appeal court held: “If calling a bond election and urging passage to secure funds for public purpose constituted a taking, the agency so acting would be subject to suit whether or not the issue carried. The expression of political preference cannot be so burdened.”
 

 And in
 
 Frisco Land & Mining Co.
 
 v.
 
 State of California, supra,
 
 74 Cal.App.3d 736, 757, the appeal court disposed of
 
 Klopping, “Since the state has never taken any action to condemn the subdivider’s property, the case does not appear pertinent.”
 
 (Italics added.)
 

 
 *948
 
 And more recently, in
 
 HFH, Ltd.
 
 v.
 
 Superior Court, supra,
 
 15 Cal.3d 508, at page 516, footnote 14, the Supreme Court categorized
 
 Klopping, supra,
 
 8 Cal.3d 39, as presenting “the distinct problems arising from unequitable zoning actions undertaken by a public agency as a prelude to public acquisition.” In the case at bench, the allegations of the complaint, viewed most favorably to Helix, does not charge State with condemning its property or with an inequitable misuse of the eminent domain processes in any way factually akin to the
 
 Klopping
 
 facts.
 

 The facts alleged in Helix’s complaint do not warrant a reasonable inference that the official State actions in any way were inequitable, unlawful, illegal or in any way in excess of the law in this State and its officials. The acts actually performed by the State officials are in nature akin to the general plan of
 
 Selby, supra,
 
 10 Cal.3d 110, or the adoption of the general freeway route in
 
 Smith, supra,
 
 50 Cal.App.3d 529. These are “several leagues short” of an expressed intent to condemn Helix’s specific properties. Land use regulations involving flood control clearly involve the exercise of the State’s police power.
 
 (Miller
 
 v.
 
 Board of Public Works,
 
 195 Cal. 477, 486, 489 [234 P. 381, 38 A.L.R. 1479].)
 

 Unchallenged State laws mandate the acts of the Legislature here complained of. (California Environmental Quality Act of 1970; Pub. Resources Code, § 21000 et seq.) Most cogent is the observation in
 
 HFH, Ltd.
 
 v.
 
 Superior Court, supra,
 
 15 Cal.3d at page 519: “Courts have thus recognized that ‘[o]f course, it is not a tort for Government to govern. . . .’ [Citations.] Justice Jackson’s mot expresses both a principle of law and a necessity of rational government; both constitutional and institutional understandings require that legislative acts, even if improper, find their judicial remedy in the undoing of the wrongful legislation, not in money damages awarded against the state. [Citations.]”
 

 If the planning activities here carried on by the responsible State officials, completely, unquestionably, in accord with unchallenged State law can be made the bases of a damage suit in inverse condemnation, “the process of community planning would either grind to a halt, or deteriorate to publication of vacuous generalizations regarding the future use of land. . . . the courts of this state would be inundated with futile litigation.”
 
 (Selby Realty Co., supra,
 
 10 Cal.3d at pp. 120-121.)
 

 We have viewed these unclear, conclusionary pleadings and the matters judicially noticed with due charity and conclude they do contain some germ of fact. Yet those well pleaded facts when given every
 
 *949
 
 favorable intendment do not give life to this otherwise moribund complaint.
 

 It is clear under all of the circumstances Helix has not stated a cause of action against either the City or State in inverse condemnation.
 

 Nuisance Charges
 

 Helix charges defendants with nuisance in its second attempt to state a cause of action: “said acts of defendant. . . have introduced a condition which . . . have directly resulted in proximately causing a public and private nuisance.”
 

 Civil Code section 3479 defines nuisance as anything which is injurious to health or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal or basin or any public park, square, street, or highway. Section 3480 defines public nuisance, while section 3481 describes a private nuisance.
 

 In
 
 Nestle
 
 v.
 
 City of Santa Monica,
 
 6 Cal.3d 920, 936 [101 Cal.Rptr. 568, 496 P.2d 480], the Supreme Court held Civil Code section 3479 was a basis for nuisance actions against public entities; and section 815 of the Government Code constituting tort liability of public entity did not create a sovereign immunity defense as to such actions based upon Civil Code sections 3479, 3480, 3481. (See also
 
 Vedder
 
 v.
 
 County of Imperial,
 
 36 Cal.App.3d 654, 661 [111 Cal.Rptr. 728].) An act of pollution, obstruction, diversion of water constitutes a nuisance under Civil Code section 3479.
 
 (People
 
 v.
 
 City of Los Angeles,
 
 160 Cal.App.2d 494, 506 [325 P.2d 639];
 
 City of Turlock
 
 v.
 
 Bristow,
 
 103 Cal.App. 750, 754 [284 P. 962].) These rules, however, do not give aid or comfort to Helix for to state a cause of action for nuisance, sufficient facts must be alleged so the court may conclude a nuisance exists within the statutory provisions.
 
 (People
 
 v.
 
 Lim,
 
 18 Cal.2d 872, 881 [118 P.2d 472];
 
 People
 
 v.
 
 Seccombe,
 
 103 Cal.App. 306, 310 [284 P. 725];
 
 Brown
 
 v.
 
 Rea,
 
 150 Cal. 171, 174, 175 [88 P. 713].) Additionally, a private party does not have a cause of action on account of a public nuisance unless he alleges facts showing
 
 special injury
 
 to himself in person or property, and of a character different in kind from that suffered by the general public.
 
 (Donahue
 
 v.
 
 Stockton Gas etc. Co.,
 
 6
 
 *950
 
 Cal.App. 276 [92 P. 196];
 
 Ward
 
 v.
 
 Oakley Co.,
 
 125 Cal.App.2d 840 [271 P.2d 536];
 
 Brown
 
 v.
 
 Rea, supra,
 
 150 Cal. at pp. 174-175.)
 

 An essential element of a cause of action for nuisance is damage or injury.
 
 (Meigs v. Pinkam,
 
 159 Cal. 104, 109 [112 P. 883].) Helix’s charges of injuries, at this time, are not present, real or ascertainable. Helix may not recover damages for potential, future injuries arising from the threat of nuisance.
 
 (Rhodes
 
 v.
 
 San Mateo Investment Co.,
 
 130 Cal.App.2d 116, 118 [278 P.2d 447].) “[T]he risk of future flooding is not an act.” It does not give rise to a cause of action for damages.
 
 (Olson
 
 v.
 
 County of Shasta,
 
 5 Cal.App.3d 336, 341 [85 Cal.Rptr. 77].)
 

 A further pleading deficiency exists. The complaint alleges no facts from which it may be concluded a nuisance is created by any act or failure to act on the part of either City or State.
 
 It is the acts of the Republic of Mexico,
 
 not the City or State, in collecting, diverting flood waters, in permitting untreated sewage to collect, that presents a future hazard to plaintiffs’ health and property.
 

 Only by some flight of fancy may we assume the City or the State can control or direct or is responsible for the actions of the Government of the United States of America in the exercise of its treaty powers with the Republic of Mexico; state law cannot be applied “to frustrate the Federal objectives” embodied in the 1944 treaty and its amendments with the Republic of Mexico.
 
 (Environmental Defense Fund
 
 v.
 
 East Bay Mun. Utility Dist.,
 
 20 Cal.3d 327, 334 [142 Cal.Rptr. 904, 572 P.2d 1128].)
 

 There is no charge that flood water inundation or pollution have occurred. However, from the pleadings, it is inferable that the Helix lands in the Tia Juana River Valley have always been subject to past flooding. At this stage it can only be speculated whether the injuries anticipated by Helix would exceed those to be expected in the absence of any flood control work on either side of the international boundary. Helix’s lands—as a result of the flood control project—may be left high and dry, benefited, or on the contrary may be subjected to some burden by way of an increased flowage easement. Helix’s pleadings leave such matters in the area of speculation. We conclude Helix complains of neither real, nor ascertainable injuries.
 

 In our search for any relief to which Helix would be entitled under their pleadings, we note a prospective nuisance may be enjoined,
 
 *951
 
 yet facts must be alleged to show the danger is probable and imminent.
 
 (Nicholson
 
 v.
 
 Getchell, 96
 
 Cal. 394, 396 [31 P. 265].)
 

 In
 
 Baldocchi
 
 v.
 
 Fifty Four Sutter Corp.,
 
 129 Cal.App. 383, 393 [18 P.2d 682], the court imposed this prerequisite to injunctive relief against nuisance; “The injury, it is true, may be only slight, but it must be real and ascertainable as distinguished from fanciful and imaginary.” Here there is a distinct lack of fact allegation from which it can be reasonably concluded that the prospective nuisance (not committed by either of these defendants) is either probable or imminent. Therefore, no cause of action is stated for equitable relief against a prospective nuisance.
 

 Judgment affirmed.
 

 Brown (Gerald), P. J., and Cologne, J., concurred.
 

 A petition for a rehearing was denied August 4, 1978.