91 Cal.App.3d 95 (1979)
154 Cal. Rptr. 54
THE PEOPLE EX REL. STATE PUBLIC WORKS BOARD et al., Petitioners,
v.
THE SUPERIOR COURT OF SONOMA COUNTY, Respondent; H.O. TIDWELL et al., Real Parties in Interest.
Docket No. 44668.
Court of Appeals of California, First District, Division Three.
February 26, 1979.
*97 COUNSEL
Evelle J. Younger and George Deukmejian, Attorneys General, R.H. Connett, Assistant Attorney General, Roderick Walston and Richard C. Jacobs, Deputy Attorneys General, for Petitioners.
No appearance for Respondent.
Duffy & Preston, Redwine & Sherrill and Justin M. McCarthy for Real Parties in Interest.
*98 OPINION
HALVONIK, J.
Real parties are owners of approximately 17 of the 40 lots in the Pacific View Estates subdivision, located west of Highway 1 between Bodega Bay and the Russian River. The property was originally owned entirely by real party Tidwell, who subdivided it in 1967 and has since sold some of the lots. As of the effective date of the 1972 Coastal Act (former Pub. Resources Code § 27000 et seq.) a total of five homes had been constructed in Pacific View Estates.
Since adoption of the coastal act only one of the owners of Pacific View Estates' property, Carl Schreffler, has applied to the coastal commission for a permit to build. The North Central Coast Regional Commission accepted a staff recommendation that his application be denied, but the state commission on appeal denied the application only temporarily, "with the provision that unless a firm commitment to purchase [by state or private trust] is made within 12 months the North Central Commission would issue a permit."
Beginning in 1973 the regional and state commissions were engaged in the process of preparing a plan for protection of the entire coastline. The preliminary plan was submitted early in 1975 and the final plan was adopted by the commission in August of 1975. Throughout the period of preparation and afterwards, the regional commission staff received letters from Pacific View Estates property owners, including some of the real parties, asking about the prospects for building. On each occasion, the staff response discouraged any owner optimism.
Beginning in the preliminary coastal plan in March of 1975, and culminating with a report to the Legislature and the Governor in March of 1976, the commission made public its list of recommended coastal property acquisitions. Pacific View Estates was targeted as a high priority purchase in the preliminary plan and as a member of priority group I in the report to the Governor and the Legislature.
As of May 25, 1978, substantially all of the land lying west of Highway 1 from Salmon Creek on the south to Goat Rock and the Russian River on the north had been acquired by the State of California with the exception of real parties' property. No sales have occurred of unimproved land in that area, except to the state.
*99 Contemporaneously with the planning and permit activities of the commission, the State Department of Parks and Recreation was considering purchasing all or part of the Pacific View Estates and some surrounding lands. Because of the commission's ruling on the Schreffler appeal, the department took the question of acquisition to the State Public Works Board, the only agency authorized to exercise the power of eminent domain. (Gov. Code, § 15855.) Though the board agreed to the purchase of the Schreffler property and authorized negotiations for parcels of unsubdivided land close to Pacific View Estates, it declined to authorize negotiations for other lots within Pacific View Estates, primarily because of the cost of the subdivided lands. The regional commission staff did not interpret the Public Works Board's action as the final word on acquisition; it continued to press for state purchase of the Pacific View Estates properties. The record reveals no other overtures made to the Public Works Board or any statements made by the board concerning future acquisition of Pacific View Estates properties.
Real parties filed a complaint in inverse condemnation, alleging that the state had acted in a manner which prevented them from exercising their rights to reasonable use, development, sale or other enjoyment of their property. They alleged that these acts exceeded mere regulation and amounted to a taking of property without payment of just compensation.
The state's demurrer was overruled and when it answered the complaint it denied the operative allegations and raised the defense that real parties had not exhausted their administrative remedies.
The state moved for summary judgment, submitting declarations in support of its motion. Real parties resisted with declarations of their own. The declaration of former regional commission member and former Sonoma County Supervisor Robert Theiller stated that there was definitely a commission policy against allowing construction of improvements to property in Pacific View Estates during the period through 1976.
Real party Jack Tidwell's declaration was more extensive, referring to many of the facts we have mentioned and concluding that the lands were "being acquired as part of a plan of acquisition and not a plan of regulation on behalf of the State of California." Based upon the state's plan of acquisition, Tidwell stated "as a fact that it would be a useless gesture on behalf of any of the plaintiffs in these proceedings to apply for a building permit in Pacific View Estates," and that in his opinion the value of his property under the present conditions was zero: "The only *100 market for land within Pacific View Estates is for sale to the State of California under such terms as may be obtained from the State of California. No purpose for which this subdivision was authorized is compatible with any plan proposed by the State as we understand those plans."
The motion for summary judgment was denied. The plea of failure to exhaust administrative remedies was rejected on the ground that a factual issue existed as to whether it was futile to pursue administrative remedies. Summary judgment on the inverse condemnation aspect of the matter was denied on the ground that, given the mass of documents on file, summary judgment would not be appropriate. People ex rel. Dept. Pub. Wks. v. McNamara Corp. Ltd. (1972) 28 Cal. App.3d 641, 652 [104 Cal. Rptr. 822], was cited as authority supporting denial of summary judgment because of massive amounts of documentary evidence.
Before a consideration of the merits, a rehearsal of the general principles controlling rulings on motions for summary judgment is in order. Summary judgment is an appropriate disposition if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. (Code Civ. Proc., § 437c.)
"A defendant moving for summary judgment must set forth with particularity competent evidentiary facts sufficient to establish every element necessary to sustain a judgment in his favor. The opposing party has no obligation to file any declarations or affidavits in order to defeat the motion unless the declarations of the moving party state facts establishing every element necessary to sustain a judgment. A moving defendant must show clearly that plaintiff's action has no merit.... It is the defendant's burden to rule out all possible merit." (Residents of Beverly Glen, Inc. v. City of Los Angeles (1973) 34 Cal. App.3d 117, 127 [109 Cal. Rptr. 724], paraphrasing Swaffield v. Universal Ecsco Corp. (1969) 271 Cal. App.2d 147, 171-172 [76 Cal. Rptr. 680].)
"In examining the sufficiency of affidavits filed in connection with the motion [for summary judgment], the affidavits of the moving party are strictly construed and those of his opponent liberally construed, and doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion." (Jacobs v. Retail Clerks Union, Local 1222 (1975) 49 Cal. App.3d 959, 964-965 [123 Cal. Rptr. 309], quoting Stationers Corp. v. Dun & Bradstreet, Inc. (1965) 62 Cal.2d 412, 417 [42 Cal. Rptr. 449, 398 P.2d 785].)
*101 The 1973 amendment to the summary judgment statute (Code Civ. Proc., § 437c) to some extent liberalized the showing necessary to establish the nonexistence of triable issues. But it did not change the rules just described. (See Beech Aircraft Corp. v. Superior Court (1976) 61 Cal. App.3d 501, 519-520 [132 Cal. Rptr. 541].)
(1) Nothing in the summary judgment statute or cases construing it suggests that summary judgment is inappropriate simply because the decision involves evaluation of a mass of documentary evidence. In People ex rel. Dept. Pub. Wks. v. McNamara Corp. Ltd., supra, 28 Cal. App.3d 641, the granting of summary judgment was reversed because a factual issue existed concerning the state engineer's possible gross error in reviewing the contractor's claims. The contractor had also been denied due process because he was refused access to the file before the state engineer. The court did say that the state was attempting to try the case upon documents submitted, noting that they constituted 2,400 pages. But it did not hold that summary disposition of a case is inappropriate whenever there is a large amount of documentary evidence. That a case may be complex or involve a great deal of evidence does not mean that it involves a material issue of fact.

I

THE DOCTRINE OF EXHAUSTION OF ADMINISTRATIVE REMEDIES AND THE FUTILITY EXCEPTION
The trial court, when rejecting the summary judgment motion, ruled that "[w]ith respect to the matter of exhaustion of administrative remedies, there is a factual issue on the futility exception to that doctrine."
(2a) Petitioner contends that there is no material factual issue because the evidence submitted by real parties does not meet the test for futility, which requires that the regional and state commissions positively declare what their ruling will be on an application to develop within Pacific View Estates.[1]
*102 (3) The doctrine of exhaustion of administrative remedies has several exceptions, one of which is that it does not apply where seeking administrative review would be a futile gesture. But that exception is a narrow one. In Gantner & Mattern Co. v. California E. Com. (1941) 17 Cal.2d 314, 318 [109 P.2d 932], the court stated that "[t]he exhaustion of remedial procedure as laid down by the statute is required unless the petitioner can positively state that the commission has declared what its ruling will be in the particular case...." The long line of decisions by the employment commission in similar situations was deemed insufficient to allow for such a positive statement of what the commission would do in the case at hand.
(2b) The futility exception has been established in several zoning cases cited by real parties and the trial court. In Dahl v. City of Palo Alto (N.D.Cal. 1974) 372 F. Supp. 647, 649, the court held that it would have been futile to apply for a zoning variance where exemption of the 291 acres involved would have been inconsistent with the ordinance's goal of preserving the land in its natural or near natural state. In Ogo Associates v. City of Torrance (1974) 37 Cal. App.3d 830, 834 [112 Cal. Rptr. 761], the court reached the same result where the zoning ordinance had been a response to the planned development of the appellants. In Eldridge v. City of Palo Alto (1976) 57 Cal. App.3d 613, 632-633 [129 Cal. Rptr. 575], a case involving the same ordinance and foothills as the Dahl case, the court also concluded that it would have been pointless to seek a variance.
Futility would seem normally to create a question of fact, depending upon the precise nature of the communications from the administrative agency and their applicability to the circumstances of the particular case. As the above-noted cases demonstrate, however, the issue may also be determined as one of law. (4) Where the facts are undisputed and only one inference is reasonable, a trial court on motion for summary judgment or an appellate court on reviewing the trial court action may properly conclude that seeking an administrative remedy either would or would not have been futile.
(2c) The facts here are undisputed. What is disputed is whether it may be inferred from those facts that seeking a permit is pointless. The trial court's action in reserving judgment upon that issue until after trial was correct unless it can be said as a matter of law that under these facts real parties were obliged to seek a permit before they could bring an action for inverse condemnation.
*103 Real parties argue that they should not be required to seek building permits before bringing an action for inverse condemnation. They say that they do not wish to build on their property. They are willing to let the state have its way and believe that they should not be forced to seek a permit they do not want as a condition to obtaining damages for the state's taking.
Petitioner replies that even if real parties are not personally interested in building, someone must seek a permit before it can be said that administrative remedies have been exhausted. The state suggests that owners not interested in building could sell options to others interested in developing the property and let them apply for building permits. Alternatively, the owner could seek a permit under a conditional sales contract. Petitioner also insists that Frisco Land & Mining Co. v. State of California (1977) 74 Cal. App.3d 736 [141 Cal. Rptr. 820], stands for the proposition that an owner is barred from maintaining an inverse condemnation action unless he or she first seeks a building permit. We agree.
Frisco is a coastal commission inverse condemnation case where building conditions imposed on permitted construction were challenged as so onerous that they made the subdivided land unsaleable. The conditions had been imposed in answer to the developer's request for a "blanket permit" authorizing construction by any individual lot owner in his subdivision. The conditions were only in the form of staff recommendations at the time, however, and the developer formally withdrew his blanket permit application. Despite his withdrawal, the regional commission adopted eight conditions to be applied to any permit for construction in the subdivision. Thereafter an individual lot owner was denied a permit because he had not satisfied the conditions. The lot owner subsequently complied with modified conditions and a permit issued. It was in this context that the developer brought an action in inverse condemnation.
The court held that the subdivider, by withdrawing his application for a blanket permit, "placed itself in the position of one who has failed to exhaust his administrative remedies." (74 Cal. App.3d at p. 754.) A contention that it would have been futile for the subdivider to seek an administrative remedy was rejected: In this case insofar as there was an intent to keep any land in its natural or near natural state it was only for a temporary period, which, as we have seen, has been authorized by the courts. In fact, however, the coastal commission consistently recognized *104 the right of lot owners, including the subdivider itself, to build homes on the lots in the subdivision, provided that they complied with conditions reasonably related to preserving attributes of the property which the electorate had deemed of importance. There was no reason why the subdivider could not have tested the validity of those conditions through the administrative and judicial proceedings provided by law. We cannot assume that any invalid conditions would have been approved after such review. (74 Cal. App.3d at p. 757.)
One compelling reason for requiring property owners to seek commission permits before raising inverse condemnation claims is that the commission should be put to the task of deciding specific cases. Its positions should not be inferred from general comments of staff and from broad statements about priorities for acquisition. Indeed, it cannot properly be inferred even from a staff recommendation. "The mere fact that the staff of the State Commission ha[s] recommended [against granting permits] does not mean that the same result would necessarily follow a public hearing by the full commission. Without some showing that the State Commission mechanically follows the recommendations of its staff, we cannot find that an appeal would have been an `idle pursuit.'" (La Costa Homeowners Association v. Wayne (1979) 89 Cal. App.3d 327, 331 [152 Cal. Rptr. 355].) The Schreffler appeal illustrates that the commission has not set rigid rules from which it will not depart in appropriate cases. In the staff report submitted to the state commission, it was recognized that the Pacific View Estates properties, since they were part of a subdivision created before the act was contemplated, presented one of the most difficult decisions facing the commission. The staff concluded that it would be unfair to the applicant to require him to wait indefinitely for a state decision on purchase priorities, but that it would be unfair to the public to allow residential development at that time. The commission adopted the staff recommendation to allow a permit to issue if the property was not purchased within one year.
Real parties object that they have been placed in limbo, unable to sell their property and unable to obtain compensation from the state. But the commission's action on the Schreffler application indicates that had they applied for permits for themselves or for potential purchasers they might well have avoided the dilemma. It suggests that the commission is sensitive to the needs of both the public and property owners and decides cases on their individual facts, not according to unyielding abstract rules.
The staff report on the Schreffler appeal noted that the decision on that application should not be taken as precedent setting. Michael Fischer, *105 executive director of the regional commission, repeatedly informed property owners that though the staff would probably recommend against granting permits to Pacific View Estates applicants, he could not predict what course the commission itself would take.
The facts here are not like those in the cases relied upon by the trial court. In each there was a sound reason for inferring that the variance would not be granted. Here, although property owners might have reason to expect that a one-year delay condition might be imposed upon their building and that the ultimate result might be state purchase, they had no good reason to anticipate outright denial of a permit. The bypassing of the administrative process denied the commission the opportunity to strike a reasonable balance between public and private interests. There is no room for a presumption that the commission will invariably sacrifice private interests to its concept of the public good. Such a presumption is demonstrably unjustified and consequently real parties cannot "positively state that the commission has declared what its ruling will be in the particular case." (Gantner & Mattern Co., supra, 17 Cal.2d at 318.)

II

SUMMARY JUDGMENT AND INVERSE CONDEMNATION
The trial court did not rule on the merits of the state's contention that summary judgment should be granted because no inverse condemnation had taken place. Instead, the court denied the motion because of the volume of documentary evidence.
As we have already observed, that ruling misinterpreted People ex rel. Dept. Pub. Wks. v. McNamara Corp. Ltd., supra, 28 Cal. App.3d 641, 652. We turn to the merits.
(5a) Petitioner, relying primarily upon Selby Realty Co. v. City of San Buenaventura (1973) 10 Cal.3d 110 [109 Cal. Rptr. 799, 514 P.2d 111], and Navajo Terminal, Inc. v. San Francisco Bay Conservation etc. Com. (1975) 46 Cal. App.3d 1 [120 Cal. Rptr. 108], contends that as a matter of law inverse condemnation has not taken place here.
In Selby the city and the county adopted a general plan proposing a street extension over portions of the plaintiff's property. The city denied plaintiff a permit to build because of its refusal to dedicate, for the extension of a street shown on the plan, some of the land on which it *106 intended to construct an apartment complex. Demurrers were sustained to a complaint seeking mandate to compel issuance of a permit and seeking damages in inverse condemnation. On appeal the Supreme Court concluded that inverse condemnation did not result from the mere adoption of a plan targeting the plaintiff's land for public use. The city's denial of a permit, however, created a cause of action in administrative mandamus.
The Selby plan contained "a priority listing of projects and programs and a similar sequence of public acquisition" and noted that listings "are coordinated and scheduled, resulting in a specific program of action for the next five or six years." (10 Cal.3d at p. 118, fn. 3.) Nevertheless, the court rejected a contention that adoption of the plan constituted a taking of property. "The adoption of a general plan is several leagues short of a firm declaration of an intention to condemn property.... In order to state a cause of action for inverse condemnation, there must be an invasion or an appropriation of some valuable property right which the landowner possesses and the invasion or appropriation must directly and specially affect the landowner to his injury. (See Hilltop Properties v. State of California (1965) 233 Cal. App.2d 349, 355-356 [43 Cal. Rptr. 605, 37 A.L.R.3d 109].) The county has not placed any obstacles in the path of plaintiff in the use of its land. Plaintiff has not been refused permission by the county to build on or subdivide its county land, and its posture is no different than that of any other landowner along the streets identified in the plan. Furthermore, the plan is subject to alteration, modification or ultimate abandonment, so that there is no assurance that any public use will eventually be made of plaintiff's property....
"The deleterious consequences of haphazard community growth in this state and the need to prevent further random development are evident to even the most casual observer. The Legislature has attempted to alleviate the problem by authorizing the adoption of long-range plans for orderly progress. Thus, it has provided not only for the adoption of general plans but also regional plans (§ 65060 et seq.), specific plans (§ 65450 et seq.), district plans (§ 66105 et seq.), and a comprehensive plan for the conservation of San Francisco Bay (§ 66650 et seq.). In addition, the voters recently passed an initiative measure providing the mechanism for adoption of plans to preserve and protect the state's coastline. (Pub. Resources Code, § 27000 et seq.)
"If a governmental entity and its responsible officials were held subject to a claim for inverse condemnation merely because a parcel of land was *107 designated for potential public use on one of these several authorized plans, the process of community planning would either grind to a halt, or deteriorate to publication of vacuous generalizations regarding the future use of land. [Fn. omitted.] We indulge in no hyperbole to suggest that if every landowner whose property might be affected at some vague and distant future time by any of these legislatively permissible plans was entitled to bring an action in declaratory relief to obtain a judicial declaration as to the validity and potential effect of the plan upon his land, the courts of this state would be inundated with futile litigation. It is clear, under all the circumstances, that plaintiff has not stated a cause of action against the county defendants for either declaratory relief or inverse condemnation." (10 Cal.3d at pp. 119-121.)
Navajo Terminals, Inc. v. San Francisco Bay Conservation etc. Com., supra, 46 Cal. App.3d 1, following Selby, held that a BCDC plan establishing a waterfront park on the plaintiff's property did not constitute a taking because the plan, under which no specific action had been taken, was only tentative and thus subject to alteration or modification.
Jones v. People ex rel. Dept. of Transportation (1978) 22 Cal.3d 144 [148 Cal. Rptr. 640, 583 P.2d 165], contains the Supreme Court's latest refinement of the Selby rule. In Jones, the Department of Public Works announced plans to construct a freeway which would cut off access to the plaintiffs' land and prevent its subdivision. After failing in efforts to sell the land, plaintiffs obtained a judgment in inverse condemnation and the state appealed. Shortly after judgment was rendered, the Legislature deleted the proposed freeway from the highway system.
In affirming the judgment, the court distinguished Selby in the following manner:
"The state contends that the adoption of the freeway route here is equivalent to the enactment of the general plan in Selby. We can acquiesce in the following proposition: if the only acts of which plaintiffs complain were the adoption of the route, the designation of their land for future acquisition, and the purchase of some of the properties along the right of way, there would be no such direct and special interference with plaintiffs' rights as to justify an action in inverse condemnation. As was pointed out in Smith v. State of California (1975) 50 Cal. App.3d 529, 536-537 [123 Cal. Rptr. 745], planning and construction of a freeway requires a substantial period of time, and a holding that announcement of *108 the plan for the freeway results in inverse condemnation of properties designated for ultimate acquisition would result in the forced purchase by the state of large amounts of property which might never be used and would severely hamper the government's ability to make needed improvements in the highway system. The need for flexibility in planning, changing the design of, or even abandoning a proposal for a highway militates against the theory that an action for inverse condemnation lies for the general effects of such conduct.
"Here, however, the state went further. It effectively denied plaintiffs the right to subdivide their land by depriving them of the access required for subdivision. Although it was the county which refused to approve plaintiffs' subdivision map providing for access from Fair Oaks Boulevard, the reason given for the refusal was the freeway agreement with the state and the provision of section 100.2 of the Streets and Highways Code that no road could be opened into a freeway without permission of the California Highway Commission." (22 Cal.3d at p. 152.)
Reading Selby with Jones suggests an interesting relationship between the doctrine of exhaustion of administrative remedies and the principles of inverse condemnation. In Selby the plaintiffs had no cause of action in inverse condemnation against the county in part because they had never sought permission to build from the county. In Jones a cause of action was stated because the public body had been asked for a permit and had refused it. The denial of a specific request to build or subdivide transmuted a tentative plan into a possible taking of property.
Whether denial of a permit constitutes a taking is dependent in part upon whether the denial is based upon a temporary measure or a permanent zoning ordinance. (6) It is well established that a freeze on building permits pending adoption of a zoning ordinance or other comprehensive plan is permissible. (See State v. Superior Court (Veta) (1974) 12 Cal.3d 237, 253-254 [115 Cal. Rptr. 497, 524 P.2d 1281].) But an ordinance permanently restricting the use of property may create a taking if the restrictions are undue. (7) Whether a particular restriction constitutes a taking or a permissible regulation is normally a question of fact. (Eldridge v. City of Palo Alto (1976) 57 Cal. App.3d 613, 626-628 [129 Cal. Rptr. 575].)
In State v. Superior Court (Veta), supra, 12 Cal.3d at page 255, the court ruled as a matter of law that denial of a building permit during the pendancy of preparation of the coastal zone plan did not amount to a *109 taking of property for public use without compensation. Veta generated a number of Court of Appeal decisions on the same theme. (See, e.g., Patterson v. Central Coast Regional Com. (1976) 58 Cal. App.3d 833 [130 Cal. Rptr. 169]; Davis v. California Coastal Zone Conservation Com. (1976) 57 Cal. App.3d 700 [129 Cal. Rptr. 417]; Reed v. California Coastal Zone Conservation Com. (1976) 55 Cal. App.3d 889 [127 Cal. Rptr. 786]; CEEED v. California Coastal Zone Conservation Com. (1974) 43 Cal. App.3d 306 [118 Cal. Rptr. 315].) All of these cases, however, involved denial of permits during the preparation phase of the coastal plan. Whether it could be said, as a matter of law, that denial of a permit one, two or five years from adoption of the plan may be justified on the ground that the property is targeted for future acquisition has never been decided.
(5b) This case, however, does not properly present that question. This is not a denial of permit case, but a case like Selby where all that exists is a plan subject to change. Until real parties have tested the plan of acquisition by seeking a permit from the commission, they cannot present the question. They have not been restricted in their ability to use their land, only chilled in their ardor for seeking a building permit. As a matter of law, under Selby, their property has not been inversely condemned.[2]
Real parties rely primarily upon Eldridge v. City of Palo Alto, supra, 57 Cal. App.3d 613, in urging that a taking occurred here, or at least that a material factual question has been raised by the declarations. In Eldridge, the court concluded that it could not say as a matter of law that the complaints did not state a cause of action for damages in inverse condemnation. (57 Cal. App.3d at p. 629.) But the open space zoning of the foothills at issue there was not an interim measure or a general plan, but a zoning ordinance in full force and effect at the time of suit. The plaintiffs' only chance to avoid it was by means of variance, a procedure the Eldridge court found futile. As the court observed in Helix Land Co. v. City of San Diego (1978) 82 Cal. App.3d 932, 945 [147 Cal. Rptr. 683], "[o]nly as mist resembles rain" do the general planning activities here resemble the established zoning ordinance of Eldridge. The permit process is the condenser. Selby, not Eldridge, controls this case.
*110 Let peremptory writ of mandate issue directing respondent superior court to vacate its order denying the People's motion for summary judgment and directing respondent to enter an order granting the People summary judgment.
White, P.J., and Feinberg, J., concurred.
The petition of the real parties in interest for a hearing by the Supreme Court was denied April 26, 1979.
NOTES
[1] Petitioner concedes that summary judgment on that part of the complaint alleging inverse condemnation of the mutual water company's existing facilities could not be justified on the ground of exhaustion of administrative remedies. The state relies upon its substantive argument in challenging the trial court ruling insofar as it affected real party mutual water company's cause of action.
[2] As mentioned above, the mutual water company plaintiff is not subject to the permit requirements because its facilities existed before the commission. However, its inverse condemnation argument would seem to be entirely dependent upon whether any owners have actually sought and been denied permits. If there is no evidence that actual owners have been improperly denied the right to build it would seem to follow that there is no evidence that the commission has in fact prevented the water company from realizing its potential. It cannot rely upon speculation that the commission would deny permits where there is no solid evidence to support the speculation.